[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 164 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 165 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 166 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 167 
To avoid confusion, I shall consider this case in the first instance as though the Morris Canal and Banking Company, instead of the State of Indiana, was the claimant upon the record. The general ground upon which *Page 168 
the claim is resisted is, that it arises upon an illegal contract. Three grounds of illegality are alleged: 1. That the purchase of state stocks by the North American Trust and Banking Company for the purpose of re-sale, upon speculation, was beyond the scope of its corporate powers, and, therefore, illegal, and that the Morris Canal and Banking Company knew that such was the object of the purchase; 2. That the North American Trust and Banking Company had no power to issue negotiable promissory notes upon time; that such notes, therefore, and the contract of sale which provided for receiving them in payment, are illegal and void; 3. That the certificates or post notes delivered in payment for the state stock, being calculated and intended for circulation, were issued in violation of the restraining act; and that the Morris Canal and Banking Company was particepscriminis.
In examining the first of these grounds, I shall not notice the position taken by the counsel for the receiver, that a mere excess of authority on the part of a corporation in making a contract, is equivalent in its effect to the violation of a positive penal enactment; because, so far as the alleged illegality consists in the purpose for which the stocks were purchased, the case can, I think, be disposed of upon principles which do not involve that question. That the North American Trust and Banking Company made the purchase with a view to a re-sale, and not to a deposit with the comptroller, seems to be established by the proof; and that such a purchase and re-sale were unauthorized and beyond the scope of the corporate powers of the company, was settled by this court in the case of Talmage
v. Pell (3 Seld., 328).
It is contended by the counsel for the claimant, that there is no evidence that the vendors, the Morris Canal and Banking Company, had any knowledge of the object of the vendees in making the purchase. I shall, however, assume that they had such knowledge; because, in the view I take *Page 169 
of the subject, it cannot affect the result. The question presented upon this branch of the case is, whether the bare knowledge by a vendor that the purchaser intends to make an unlawful use of the article sold, will prevent a recovery for the purchase money. Although I deem this question clear upon principle, I shall, nevertheless, rest my opinion in regard to it mainly upon the authorities.
A question somewhat analogous arose in the court of king's bench, in England, in the case of Faikney v. Reynous (4Burr., 2069). The plaintiff and one of the defendants had been jointly concerned in stock-jobbing; and the plaintiff, in contravention of an express statute, had advanced £ 3000, in compounding certain differences, for one-half of which the defendants had given the bond upon which the action was brought. Upon demurrer to a plea setting up these facts, the court held the plaintiff entitled to recover. Although that case differs from the one under consideration, in its facts, yet the principle upon which the case was decided, viz., that a party to a contract, innocent in itself, is not responsible for or affected by the use which the other may make of the subject of the contract, is equally applicable here. Lord Mansfield said, in speaking of the act of the defendant in giving the bond: "This
is not prohibited. He is not concerned in the use which the other makes of the money; he may apply it as he thinks proper. But certainly this is a fair, honest transaction between thesetwo."
There is a class of English cases which seems to me identical in principle with the present, and concerning which the decisions have been unvarying. I refer to the cases of goods purchased for the express purpose of being smuggled into England, in violation of the revenue laws, and where the object of the purchase was known to the vendor. The first of these cases is that of Holman
v. Johnson (Cowp., 341), where the plaintiff, residing at Dunkirk, had sold to the defendant a quantity of tea, knowing that *Page 170 
the latter intended to smuggle it into England, but had himself no concern in the smuggling. The action was brought for the price of the tea, and it was held, upon these facts, that the plaintiff could recover. The principle of the case is the same as that adopted in Faikney v. Reynous (supra), that mere knowledge by the vendor of the unlawful intent did not make him a participator in the guilt of the purchaser. Lord Mansfiled, who delivered the opinion in this case also, says: "The seller indeedknows what the buyer is going to do with the goods; but the interest of the vendor is totally at an end, and his contract complete by the delivery of the goods."
Where, however, the seller does any act which is calculated to facilitate the smuggling, such as packing the goods, in a particular manner, he is regarded as particeps criminis, and cannot recover; as is shown by the subsequent cases of Biggs v.Lawrence (3 Term R., 454), Clugas v. Penaluna (4 id.,
466), and Waymell v. Reed (5 id., 590). These were all cases where the plaintiff had sold goods to the defendant,knowing that they were to be smuggled into England; and in each of them the plaintiff was nonsuited. But they all differed from the case of Holman v. Johnson, in this, that the plaintiff had in each case done some act, in addition to the sale, in aid and furtherance of the defendant's design to violate the revenue laws, and the decision was in each case placed distinctly upon this ground. The language of Buller, J., in the case of Waymell
v. Reed, is very explicit He says: "In Holman v. Johnson,
the seller did not assist the buyer in the smuggling. He merely sold the goods in the common and ordinary course of trade. But this case does not rest merely on the circumstance of the plaintiff's knowledge of the use intended to be made of the goods; for he actually assisted the defendants in the act of smuggling, by packing the goods up in a manner most convenient for that purpose." *Page 171 
In each of the three cases last cited, special care is taken to guard against any inference that it was intended to impair the force of the decision in Holman v. Johnson. Indeed, that decision seems to have been uniformly followed by the courts of England from that day to the present. In 1835 the question again arose in the case of Pellecat v. Angell (2 Crompt., Mees. Ros., 311), and the court held that the plaintiff could recover the price of goods sold to the defendant, although he knew at the time of the sale that they were bought to be smuggled into England. Lord Abinger says: "The distinction is, where he takes an actual part in the illegal adventure, as in packing the goods in prohibited parcels, or otherwise, there he must take the consequences of his own act." Again he says: "The plaintiff sold the goods; the defendant might smuggle them if he liked, or he might change his mind the next day; it does not at all import a contract, of which the smuggling was an essential part." It is true, the Chief Baron in one part of his opinion seems to lay some stress upon the fact that the plaintiff was a foreigner; but it is clear that this can have nothing to do with the principle upon which those cases rest, which is, that the act of selling is not in itself a violation of the law; and the mere fact of knowledge of the unlawful intent of the vendee does not make the vendor a participator in the guilt. The language of the associates of the Chief Baron goes to show that the domicil of the plaintiff had no influence upon the decision. Bolland, B., says: "I think the distinction pointed out by the Lord Chief Baron, between merely knowing of the illegal purpose, and being a party to it by some act, is the true one." Alderson, B., says: "If the plea disclosed circumstances from which it followed, that permitting the plaintiff to recover would be permitting him to receive the fruits of an illegal act, the argument for the defendant would be right; but that ground fails, because the mere sale to a party, although he may intend to commit an illegal act, is no breach of law." That the place of residence *Page 172 
of the vendor has nothing to do with the question, and that the principle of the case of Holman v. Johnson is sound, is further shown by the case of Hodgson v. Temple (5 Taunt.,
181), decided by the court of common pleas in England. There, as it would seem, all the parties resided in London. The plaintiffs, who were distillers, had sold spiritous liquors to the defendant with full knowledge that the latter intended to retail them, in express violation of the revenue laws. It was insisted, in defence to an action brought for the purchase money of the liquors, that the plaintiffs were particeps criminis, and could not recover. But Mansfield, Ch. J., said: "This would be carrying the law much further than it has ever yet been carried. The merely selling goods knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment; but to effect that it is necessary that the vendor should be a sharer in the illegal transaction."
Oppossed to this series of cases, holding one uniform language, and sanctioned by such names as Mansfield, Buller, Kenyon, Abinger and others, I know of but a single English case, viz, that of Langton and others v. Hughes. (1 Maule Sel.,
593). By a statute of 42 Geo. III., brewers were prohibited from using anything but malt and hops in the brewing of beer. The plaintiffs, who were druggists, had sold to the defendants, who were brewers, certain drugs, knowing that they were to be used contrary to the statute. In the 51 Geo. III., another statute was passed prohibiting druggists from selling to brewers certain articles, and among them those sold to defendants. The sale in question was made before the latter statute, but the suit was brought afterwards. The court held that the plaintiff could not recover. It is difficult to ascertain from the opinions the precise ground upon which the court intended to rest its decision. The case was so clearly within the terms of the statute of 51 Geo. III., that the judges were evidently *Page 173 
induced to resort to a somewhat strained construction of the previous statute, and even to an attempt to connect that with the statute passed after the sale, for the sake of sustaining the defence. Le Blanc, J., after stating the question, says: "That depends upon the provisions of 42 Geo. III., coupling them in their construction with those of 51 Geo. III." It is apparent, I think, upon a review of the whole case, that it was not very well considered, and that the decision was really produced by the reflex influence of the latter statute. This case, therefore, which does not appear to have been followed either in England or in this country, and which is virtually overruled by the subsequent case of Pellecat v. Angell (2 Crompt., Mees. Ros., 311), can have but little weight in opposition to the numerous authorities to which I have referred, going to establish the contrary principle.
There is another class of English cases which have been sometimes supposed to conflict with the doctrine advanced inFaikney v. Reynous and Holman v. Johnson (supra), but which, when the precise ground upon which they were decided is considered, will be found to support rather than to detract from the doctrine. That ground is this: that it was the express object of the plaintiffs in those cases, in selling the goods or lending the money, that they should be used for an unlawful purpose, and that such purpose entered into and formed a part of the contract of sale or loan. A brief reference to those cases will show that this is the principle upon which they rest. The first case of this class is that of Lightfoot et al. v. Tennant (1 Bos. Pull., 551). The action was upon a bond given for goods sold, and the defendant pleaded that the plaintiff sold the goods "in order that" they should be shipped to the East Indies without the license of the East India Company, in violation of an express statute. The issue upon this plea was found for the defendant, and a motion for judgment non obstante veredicto was denied. Eyre, Ch. J., argues, that the jury having *Page 174 
found that the plaintiff sold the goods "in order that" they should be shipped, c., it cannot be said that he had no interest in their future destination; that he may well have sold the goods for an enhanced price, relying exclusively upon the profits to be realized from the illicit trade for payment. He says: "It is a possible case, that a tradesman may wish to speculate in this contraband trade, and to do it by dividing the profits with some man of spirit and enterprise, but without capital. Such a man would stipulate that the goods which he sold should be put on board a ship under a foreign commission, and should be sent to Calcutta to be there sold. His share of the profits would be found in the price originally fixed on the goods, but his hopes of payment would rest entirely on the returns of this contraband trade." Again he says: "But the jury having found for the plea, the court cannot say that the plaintiff had nothing to do with the future destination of the goods; unless it was impossible to state a case in which they could have anything to do with it." The decision in this case clearly is based upon the fact, that the future use to be made of the goods entered into and formed a part of the contract of sale. There are two other English cases belonging to the same class. The first is that of Cannan v.Bryce. (3 Baru. Ald., 179). The defendant had lent money to a firm, which afterwards became bankrupt, for the purpose of paying a balance due upon certain illegal stock-jobbing transactions, and which had been applied to that object. He having afterwards received money belonging to the bankrupts, the assignees brought their action to recover those moneys, and it was held that the defendant could not set off his demand for the money loaned. The other case is that of McKinnell v. Robinson
(3 Mees. Wels., 434), which was an action of assumpsit for money lent. The defendant pleaded that the money was lent in a certain common gambling room, for the purpose of the defendant's illegally playing and gaming therewith; and on demurrer the plea *Page 175 
was held good. In each of these cases it will be seen that the illegal use was the express object for which the money was lent; and this is relied upon by the court in both cases in giving their judgment. In the case of Cannan v. Bryce, Abbott, Ch. J., says: "It will be recollected that I am speaking of a case wherein the means were furnished with a full knowledge of the object to which they were to be applied, and for the express purpose of accomplishing that object:" and in the case ofMcKinnell v. Robinson, Lord Abinger, in stating the principle by which the case was governed, says: "This principle is, that the repayment of money lent for the express purpose of accomplishing an illegal object, cannot be enforced."
It is worthy of note that the three cases last referred to present the views respectively of the heads of the three principal English courts, viz., Abbott, chief justice of the king's bench, Eyre, chief justice of the common pleas, and Abinger, chief baron of the exchequer; and their concurrence in resting their decisions upon the fact that the illegal object was in the contemplation of both parties, and formed a part of the original contract, goes strongly to confirm the doctrine of the cases of Faikney v. Reynous, Holman v. Johnson, c. (supra). Indeed the whole current of English authority goes to support those cases, with the single exception of Langton etal. v. Hughes (supra). They have also frequently been referred to by the courts in this country as containing sound doctrine. (De Groot v. Van Duzer, 17 Wend., 170;Merchants' Bank v. Spalding, 12 Bar. S.C.R., 302;Armstrong v. Toler, 11 Wheat., 258.) In the latter case, Chief Justice Marshall refers to the case of Faikney v.Reynous in the following terms: "The general proposition stated by Lord Mansfield, in Faikney v. Reynous, that if one person pay the debt of another at his request, an action may be sustained to recover the money, although the original contract was unlawful, goes far in deciding the question now before the court. That the person who paid *Page 176 
the money knew it was paid in discharge of a debt not recoverable at law, has never been held to alter the case."
The principles established by this strong array of authorities are in entire accordance with the case of Talmage v. Pell (3Seld., 328), decided by this court. It was a part of the contract in that case, between the banking company and the commissioners of the State of Ohio, that the bonds should remain in the hands of the agent of the state, to be sold on account of the banking company; and this fact is referred to and relied upon by Gardiner, J., by whom the opinion of the court was delivered. He says: "I am, for the reasons suggested, of the opinion that this bank had no authority to traffic in stocks as an article of merchandise, or to purchase them for the purpose of selling, as a means of obtaining money to discharge existing liabilities; that as the object of the purchase in this case was known to both parties, and made a part of their contract, the debt for the purchase money cannot be enforced by the vendors, and that the collateral securities must stand or fall with the principal agreement." The case contains no intimation whatever that the mere knowledge, by the agents of the State of Ohio, that the banking company purchased the bonds with a view to a resale, would have defeated a recovery. On the contrary, such an inference was carefully guarded against by the learned judge who delivered the opinion, as appears from the extract just given.
I consider it, therefore, as entirely settled by the authorities to which I have referred, that it is no defence to an action brought to recover the price of goods sold, that the vendor knew that they were bought for an illegal purpose, provided it is not made a part of the contract that they shall be used for that purpose; and, provided also, that the vendor has done nothing in aid or furtherance of the unlawful design. If, in this case, the bank had had no right to purchase state stocks for any purpose, then the contract of sale would have been necessarily illegal, and the vendor *Page 177 
would, perhaps, be precluded from all remedy for the purchase money. But here the purchase and sale for a lawful object was a contract which each party had a perfect right to make. Suppose the banking company, although intending at the time of the purchase to use the stocks for trading purposes, had, the next day, abandoned this intention and deposited them with the comptroller; would this change of purpose reflect back upon the contract of purchase, if it was corrupt, and divest it of its illegal taint? This could hardly be pretended; and, if not, then the consequence of the doctrine contended for here, would inevitably be, that the vendor of the stocks, without having participated in any illegal act, or even illegal intent, but having simply known of such an intent subsequently abandoned, would be punished with a total loss of the property sold, and that for the benefit of the party alone guilty, if guilt could be predicated of such a transaction.
I am not aware of any principle which could justify this. The law does not punish a wrongful intent, when nothing is done to carry that intent into effect; much less, bare knowledge of such an intent, without any participation in it. Upon the whole, I think it clear, in reason as well as upon authority, that in a case like this, where the sale is not necessarily per se a violation of law, unless the unlawful purpose enters into and forms a part of the contract of sale, the vendee cannot set up his own illegal intent in bar of an action for the purchase money.
It follows, from this, that the sale of the stocks would have created a valid and legal obligation on the part of the banking company to pay the purchase money, but for the form of the security agreed to be taken in payment; and this brings me to the consideration of the second ground of defence, viz., that the North American Trust and Banking Company had no authority to issue negotiable promissory notes, payable at a future day; and, consequently, that the *Page 178 
contract which provided for their issue and for receiving them in payment, was illegal and void.
In considering this branch of the case, I shall not examine at length the questions so ably argued at bar, in regard to the nature of corporations and the limitations of their powers, but shall assume it to have been established, for the purposes of this case, at least, that associations under the general banking law, even prior to the act of 1840 (Laws of 1840, 306, § 4), had no power to issue negotiable notes upon time; placing this assumption, however, not upon the safety fund act of 1829 (Lawsof 1829, 167), but upon the general principle of law which limits corporations to the exercise of powers expressly given to them, or such as are necessarily incident thereto, and upon the statute confirmatory of that principle. (1 R.S., 600, § 3.)
It follows, that in issuing the certificates or post notes delivered to the Morris Canal and Banking Company in consideration of the stocks transferred, the North American Trust and Banking Company exceeded its corporate powers. That those certificates were negotiable promissory notes, is clear. (Bankof Orleans v. Merrill, 2 Hill, 295; Leavitt v. Palmer, 3Comst., 19; Talmage v. Pell, 3 Seld., 328.) Does this act of the Trust and Banking Company, thus transcending its legitimate powers, so taint and corrupt the contract of sale as to deprive the vendors of the stocks of all remedy for the purchase money? The counsel for the claimants sought upon the argument to maintain that the sale of the stocks and the receipt of the certificates were distinct transactions; and, hence, that the debt created by the sale would remain, notwithstanding the illegality of the securities. In this, however, he is not sustained, I think, by the evidence. The proof seems to be clear, that the agreement to receive the certificates or post notes was simultaneous with and formed a part of the contract of purchase It becomes necessary, therefore, to meet the question, whether the consent and agreement of the vendors to *Page 179 
receive the certificates in payment, will prevent a recovery inany form for the stock sold.
It results, from what has been previously said, that there was nothing in the contract of sale, considered by itself, separately from the agreement in relation to the security, to impair the validity of the debt; but, on the contrary, that the sale of the stocks created as valid and meritorious a consideration for the obligation assumed by the Trust and Banking Company as if the money had actually been deposited according to the tenor of the certificates. The objection to the claim, therefore, rests upon the nature of the securities alone, and acquires no additional force from the want of power in the Trust and Banking Company to traffic in stocks.
It has long been settled that contracts founded upon an illegal consideration, or which contemplate the performance of that which is either malum in se, or prohibited by some positive statute, are void. But the application of this rule to contracts made by corporations, the sole objection to which consists in their beingultra vires, is comparatively modern. The doctrine rests mainly upon three recent English cases, viz., East Anglian RailwayCompany v. Eastern Counties Railway Company (7 Eng. Law andEq. R., 505); McGregor v. The Official Manager of the Dealand Dover Railway Company (16 id., 180); and The Mayor ofNorwich v. The Norfolk Railway Company (30 id., 120).
That a contract by a corporation, which it has no legal capacity to make, is void and cannot be enforced, it would seem difficult to deny; and this principle alone is abundantly sufficient to sustain the cases above cited, which were all actions founded upon and affirming the validity of the illegal contract. But it is quite another question whether such a contract is so tainted with corruption, that the party dealing with the corporation will be refused all remedy in a suit proceeding upon the ground of a disaffirmance of the contract, and asking only such relief as equity *Page 180 
demands. Whether a contract of this nature can fairly be brought, consistently with either reason or adjudged cases, within the range of the maxim, ex turpi causa non oritur actio, cannot be considered as settled by the cases referred to; especially, as in the last of those cases the court was equally divided, and it was only disposed of by one of the judges withdrawing his opinion with a view to an appeal.
Prior to the case of East Anglian Railway Company v. EasternCounties Railway Company (supra), the rule which denied all relief, in equity as well as at law, to any party to an illegal contract, had been generally applied only to cases where the contract was either malum in se or specifically prohibited by statute. It was wholly unnecessary to the decision of that case to resort to any extension of that rule; because, to enforce a contract against a party, which that party was incompetent in law to make, would, indeed, be, in the language of some of the cases, "to make the law an instrument in its own subversion." The courts, however, in that as well as the two subsequent cases, do appear to have been inclined to hold that contracts of corporations, which are ultra vires merely, come within the general rule which denies all aid to either party to a contract made in violation of law. But it will not be necessary here to pass upon the correctness of this doctrine advanced in those cases, as, in the view I take of this case, it falls clearly within an exception to that rule; and, for the purposes of this question, I shall concede: 1. That the issuing and delivery by the North American Trust and Banking Company of its promissory notes payable on time, was ultra vires; and that the effect of this upon the contract was the same as if it had been specifically prohibited under a penalty; and 2. That the notes issued were calculated and intended for circulation as money, and were, therefore, issued contrary to the inhibitions of the restraining act. These concessions are made for the purposes of this case *Page 181 
only, and without intending definitely to decide the points conceded.
There are one or two classes of cases to which it will be necessary to refer in order to afford a clear view of the question here presented. The first consists in a series of cases in which a distinction has been taken between those illegal contracts where both parties are equally culpable, and those in which, although both have participated in the illegal act, the guilt rests chiefly upon one. The maxim, ex dolo malo non orituractio is qualified by another, viz., in pari delicto melior estconditio defendentis. Unless, therefore, the parties are inpari delicto as well as particeps criminis, the courts, although the contract be illegal, will afford relief, where equity requires it, to the more innocent party.
It was insisted by the counsel for the receiver, upon the argument, that in no case would relief be afforded to any party to an illegal contract, unless he applied for such relief, or, at least, had elected to disaffirm the contract while it remainedexecutory. This position cannot, I think, be sustained. It overlooks distinctions which are clearly settled. The cases in which the courts will give relief to one of the parties on the ground that he is not in pari delicto, form an independent class, entirely distinct from those cases which rest upon a disaffirmance of the contract before it is executed. It is essential, to both classes, that the contract be merely malumprohibitum. If malum in se, the courts will in no case interfere to relieve either party from any of its consequences. But where the contract neither involves moral turpitude nor violates any general principle of public policy, and money or property has been advanced upon it, relief will be granted to the party making the advance: 1. Where he is not in pari delicto;
or, 2. In some cases where he elects to disaffirm the contract while it remains executory. In cases belonging to the first of these classes, it is of no importance whether the contract has been executed or not; and in those belonging to the second, it is *Page 182 
equally unimportant that the parties are in pari delicto. This will clearly appear upon a brief review of some of the leading cases.
The first case which I deem it material to notice is that ofSmith v. Bromley (Doug., 670, in note). The plaintiff's brother having become bankrupt, and a commission having been taken out against him, the plaintiff advanced £ 40 to the defendant, who was the principal creditor, to induce him to sign the certificate. The action, which was brought to recover this money, was sustained. In reply to the argument that the plaintiff was seeking to recover back money paid upon an illegal contract, Lord Mansfield said: "If the act is in itself immoral, or a violation of the general laws of public policy, then the party paying shall not have this action; for when both parties are equally criminal against such general laws, the rule is potiorest conditio defendentis. But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, c. If such laws are violated, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover; and it is astonishing that the reports do not distinguish between violations of the one sort and the other." Two things are to be noted in this extract. That a distinction is taken between contracts malum prohibitum merely, and such as are immoral or contrary to general principles of policy; and also that stress is laid upon the fact that the law contravened in this case was intended to protect one party from oppression by the other. The first is a valid distinction, which runs through all the subsequent cases — the last was merely incidental to the particular case, and not essential to the principle. The first cases in which the principle was applied, were naturally those where the statute violated was intended for the special protection of the party seeking relief from some undue advantage taken by the other, because those were the cases in which the injustice of applying the same rule to both parties would be *Page 183 
the most glaring. But it soon came to be seen that the principle was equally applicable to cases where the law infringed was intended for the protection of the public in general.
The case of Jaques v. Golightly (2 W. Bl., 1073) was an action brought to recover back money paid for insuring lottery tickets. The defendant kept an office for insurance contrary to the statue 14 Geo. III., ch. 76. It was urged that the plaintiff being particeps criminis, and having knowingly transgressed a public law, was not entitled to relief; but the action was sustained by the unanimous opinion of the court. Blackstone, J., said: "These lottery acts differ from the stock-jobbing act of 7 Geo. II., ch. 8, because there both parties are made criminal and subject to penalties." The rule here suggested for determining whether the parties are in pari delicto, seems reasonable and just. There are, undoubtedly, other cases in which the parties are not equally guilty; but it is safe to assume, that whenever the statute imposes a penalty upon one party and none upon the other, they are not to be regarded as par delictum. InBrowning v. Morris (2 Cowp., 790), Lord Mansfield, after referring with approbation to the case of Jaques v.Golightly, reiterates the argument of Blackstone, J., in that case. He says: "and it is very material that the statute itself, by the distinction it makes, has marked the criminal, for the penalties are all on one side — upon the office-keeper."
The question next arose in the case of Jaques v. Withy (1Hen. Black, 65), which is identical with the case of Jaques
v. Golightly, decided by the same court fifteen years before. The action was brought to recover back money paid for insurance to the keeper of a lottery insurance office, and it was held to lie. It will be seen that these two cases are not like that ofSmith v. Bromley where an undue advantage was taken of the peculiar situation of the plaintiff; and that although some effort is made in Jaques v. Golightly, and by Lord Mansfield in Browning v. Morris, *Page 184 
(supra), to bring them within the reasoning of that case, they are really placed upon the broad ground that the parties are notin pari delicto, and, as evidence of this, the court rely upon the fact that the penalty was imposed upon the defendant alone. A similar question came before the court of king's bench in the case of Williams v. Hedley (8 East., 378), where the previous cases were ably and elaborately reviewed by Lord Ellenborough. The action was brought to recover back money which had been paid by the plaintiff to compromise a qui tam action pending against him for usury. The principle of the decision cannot be better stated than by transcribing the head note of the reporter, which is this: "Money paid by A to B, in order to compromise a qui tam action of usury brought by B against A on the ground of a usurious transaction between the latter and one E, may be recovered back in an action by A for money had and received. For the prohibition and penalties of the statute of 18 Eliz., ch. 5, attach only on the informer or plaintiff or other person suing out process in the penal action making composition,c., contrary to the statute, and not upon the party paying the composition; and, therefore, the latter does not stand, in this respect, in pari delicto, nor is he particeps criminis with such compounding informer or plaintiff."
These are the leading English cases on this subject; and it is plain that they do not rest solely upon the ground that the statute infringed was intended to protect one party from acts of oppression or extortion by the other; and equally plain that relief is granted in this class of cases entirely irrespective of the question whether the contract be executed or executory. It was, in fact, executed in all these cases.
The series of cases here referred to have never been overruled. On the contrary, they have been expressly sanctioned and approved in several American cases. In Inhabitants of Worcester v.Eaton (11, Mass., 368), Chief Justice Parker, after referring to the cases of Smith v. Bromley and Browning *Page 185 
v. Morris (supra), and to the distinction there taken, says:
This distinction seems to have been ever afterwards observed in the English courts; and being founded in sound principle, is worthy of adoption as a principle of common law in this country." The case of White v. Franklin Bank (22 Pick., 181), proceeds upon the same distinction. It is impossible, as it seems to me, to distinguish this case in principle from that now before the court. The Revised Statutes of Massachusetts (ch. 36.,sec. 57) prohibited banks from making any contract "for the payment of money at a future day certain," under a penalty of a forfeiture of their charter. The plaintiff had deposited money with the defendant in February, to remain until the 10th day of August; and the action was brought to recover this money. It was objected that the contract was illegal and the parties particepscriminis, but the defence was overruled. This is by no means an anomalous case, as the counsel for the receiver upon the argument of this case seemed to suppose. On the contrary, it belongs clearly to the same class with the English cases just reviewed. Wilde, J., who delivered the opinion of the court, after referring to those cases, and quoting the remarks of Chief Justice Parker in Inhabitants of Worcester v. Eaton, given above, says: "The principle is in every respect applicable to the present case, and is decisive. The prohibition is particularly leveled against the bank, and not against any person dealing with the bank. In the words of Lord Mansfield, `the statute itself, by the distinction it makes, has marked the criminal.' The plaintiff is subject to no penalty, but the defendants are liable for the violation of the statute to a forfeiture of their charter."
Again, in the case of Lowell v. Boston and Lowell RailroadCompany (23 Pick., 24), where the objection was raised that the parties were particeps criminis, the same justice says: "In respect to offences in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But *Page 186 
where the offence is merely malum prohibitum, and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrong-doers." The same doctrine was reiterated in Atlas Bank v.Nahant Bank (3 Met., 581). The principle of these cases was also adopted by our own supreme court in the case Mount v.Waite (7 John., 434). The action was to recover back money which the plaintiffs had paid to the defendants for insuring lottery tickets contrary to the policy of a statute passed in 1807. Kent, Ch. J., says: "The plaintiffs here committed no crime in making the contract. They violated no statute, nor was the contract malum in se. I think, therefore, the maxim as to parties in pari delicto does not apply, for the plaintiffs were not in delicto."
This case is the last of the class to which I shall refer; and I think it would be difficult to find a series of cases, running through almost a century, more uniform and consistent in tone and principle and in the distinctions upon which they are based. They have never, so far as I am aware, been overruled; and I know of no principle which would justify this court in disregarding them. The doctrine seems to me eminently reasonable and just, and I discover no principle of public policy to which it stands opposed. On the contrary, I concur in the sentiment which Judge Wilde, in White v. Franklin Bank, expresses, thus: "To decide that this action cannot be maintained, would be to secure to the defendants the fruits of an illegal transaction, and would operate as a temptation to all banks to violate the statute by taking advantage of the unwary and of those who may have no actual knowledge of the existence of the prohibition, and who may deal with a bank without any suspicion of the illegality of the transaction on the part of the bank."
This language is as applicable to the case before us as to that in which it was used. It is said that all persons dealing *Page 187 
with banks and other corporations are presumed to know the extent of their powers. This is no doubt technically true, and yet we cannot shut our eyes to the fact, that in very many cases it is a mere legal fiction. If we take the present case as an example, it is plain that it would not have been easy for the Morris Canal and Banking Company, with the charter of the Trust and Banking Company and the restraining act both before them, to determine whether the issue of these certificates in payment for state stocks would violate either; and yet, upon the doctrine here contended for, an honest mistake in this respect would visit upon the former company a forfeiture of the entire amount of stocks transferred, which the latter company, if disposed, might pocket. Such a principle would afford the strongest possible inducement for banks to transgress the law. All that they could get into their hands, by persuading others to take their unauthorized paper, would be theirs. Under such a rule, arguments to make it appear that they have power to do what they really have not, might be made to constitute the most available portion of their capital; and unauthorized dealing in large amounts, with foreign states or corporations not familiar with our laws, the most profitable branch of their business. These considerations go, in my judgment, to strengthen and confirm the doctrine of the cases referred to, which hold that relief may be granted to the more innocent, when the parties are not in pari delicto.
The rule laid down in those cases for determining which is the more guilty party is directly applicable to the present case, so far as the transaction is held to fall within the provisions of the restraining act. It has been conceded, as was contended by the counsel for the receiver upon the argument, that the issuing of the certificates in this case was a violation of §§ 3, 6 and 7 of the act concerning unauthorized banking. (1 R.S., 712.) It will be seen, by referring to those sections, that the penalties are imposed exclusively upon the corporation violating the provisions of the act, and *Page 188 
upon its officers and members. So far, therefore, as the defence is based upon a violation of the restraining act, there is that statutory designation of the guilty party upon which most of the cases to which I have referred are made to rest. But it is obvious that the general principle for which I contend applies equally to that branch of the defence which rests upon the ground that the act of the banking company, in issuing the notes, wasultra vires and against public policy. The imposition of the penalties for a violation of the restraining law upon the corporation alone, does not make it the guilty party, but it is simply evidence that the legislature so regarded it; and the reasons are equally strong for fixing the principal guilt upon the same party where its acts merely violate the principle of public policy. Although persons dealing with corporations are, for certain purposes, presumed to know the extent of their corporate powers, yet this is by no means a safe rule by which to measure the moral delinquency of the respective parties. To me, therefore, it seems plain, that whether we regard the act of the Trust and Banking Company in issuing the certificates in question as a violation of the restraining law, or as simply ultravires, or as against public policy, the corporation is to be regarded as comparatively the guilty party.
I wish here briefly to refer to another class of cases decided in this state, and known as the Utica insurance cases, not as authority for my conclusion, but by way of illustrating the distinctions to which I have adverted. The first of these is TheUtica Insurance Company v. Scott (19 John., 1). The action was upon a promissory note discounted by the insurance company in the ordinary way of discounting by a bank. It was held that the insurance company had no power to discount notes; and that in so doing it had violated the restraining act. But the court say: "In analogy to the statute against gaming, the notes and securities are absolutely void, into whatever hands they may pass; but there is a material distinction between the *Page 189 security and the contract of lending. The lending of money is not declared to be void, and, therefore, whenever money has been lent, it may be recovered, although the security itself is void." Judgment was, however, given for the defendant in that case, because the action was brought upon the note alone. The next case was that of The Utica Insurance Company v. Kip (8 Cow.,
20). This, also, was an action upon a note discounted by the insurance company; but the declaration also contained a count for money lent. The plaintiff recovered; and the court say: "The illegal contract, if any, was not the loan, for the plaintiffs had a right to loan the money to the defendants; but it was the agreement to secure the loan by a note discounted. Avoiding what was illegal, does not avoid what was lawful. The action formoney lent, is rather a disaffirmance of the illegal contract." Similar decisions were made in three subsequent cases, viz: TheUtica Insurance Company v. Cadwell (3 Wend., 296); Same v.Kip (3 id., 369); and Same v. Bloodgood (4 id., 652).
These cases have never been overruled; and yet, I think I may say, they have generally been regarded with some suspicion as to their soundness. In New Hope Company v. Poughkeepsie SilkCompany (25 Wend., 648), Nelson, J., in speaking of them, says: "Whether the doctrine of these cases is well founded and may be upheld upon established principles or not, or whether the result was not ultimately influenced by the peculiar phraseology and powers of the charter of The Utica Insurance Company, in respect to which they arose, it is not necessary at present to examine. I am free to say, in either aspect, I should have great difficulty in assenting to them." There is, undoubtedly, "great difficulty" in reconciling these cases with the settled rules in regard to illegal contracts; and the difficulty consists precisely in this, that the court, in the Utica insurance cases, have given to the guilty party the benefit of a principle which is only applicable to the more innocent. In *Page 190 
the first case in which the insurance company recovered, viz.,The Utica Insurance Company v. Kip, the court cite and rely upon the following passage from Comyn: "Where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, such an action can in no case be maintained; but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it, presumes it to be void and seeks to prevent the defendant from retaining the benefit which hederived from an unlawful act, there it is consonant to the spirit and policy of the law that he should recover." (2 Comynon Contracts, part 2, ch. 4, art. 20.) Comyn cites, as authority for this passage, the case of Jaques v. Withy (1Hen. Bl., 65), which is one of the cases to which I have referred, in which the plaintiff recovered on the ground that he was not in pari delicto with the defendant; and on turning to that case it will be seen that the passage is copied verbatim
from the argument of Sergeant Adair, counsel for the plaintiff. It is thus made apparent that the doctrine of the Utica insurance cases is built, in part, at least, upon the principles and arguments which lie at the foundation of the class of cases just passed in review. More can scarcely be needed to justify the doubt which has been cast upon these insurance cases. How principles, appropriately used to sustain a recovery against a party, upon the express ground that he is the party upon whom the prohibition and penalties of the law attach, can be made available to justify a recovery by a party so situated, is certainly difficult to comprehend.
But, notwithstanding the misapplication to these cases of the principles for which I contend, the cases themselves afford strong evidence of the appreciation, by the court, of the soundness of those principles. Indeed, few, as it seems to me, will be found to deny either the justice or policy of the rule which refuses to permit the guilty party to retain the fruits of an illegal transaction at the expense of the *Page 191 
more innocent. But were it otherwise, the rule, as I have shown, is indisputably established; and that the present case falls within that rule is entirely clear. We have next, then, to ascertain the relief to which the Morris Canal and Banking Company would, if the claimant upon the record, be entitled.
The illegal contract itself is of course void, and no part of it can he enforced. It is impossible, I think, to sustain the reasoning adopted in the Utica insurance cases; by which that part of the contract which embraces the loan (in this case, the sale) is separated from the portion relating to the security, and upheld as a distinct and valid contract. The contract there, as here, was entire; and it is contrary to all the rules which have been applied to illegal contracts to discriminate between their different parts, and hold one portion valid and the other void. Recoveries are not had in such cases upon the basis of theexpress contract, which is tainted with illegality; but upon an implied contract, founded upon the moral obligation resting upon the defendant to account for the money or property received. The claim presented by the State of Indiana to the referees was in general terms, and broad enough to embrace a demand arising upon an implied contract to pay for the bonds transferred; and it has been repeatedly held that a corporation may become liable upon such a contract founded upon a moral obligation, like that existing in this case. (Bank of Columbia v. Patterson, Adm.,
7 Cranch, 299; Danforth v. Schoharie Turnpike Company, 12John., 227; Bank of U.S. v. Dandrige, 12 Wheat., 64.)
It follows, from these principles, that if the Morris Canal and Banking Company was the claimant upon the record, it would be entitled to recover, not the specific balance due upon the certificates, nor the price agreed to be paid for the stocks, but so much as the stocks transferred were reasonably worth at the time of such transfer, with interest, deducting therefrom whatever has been actually paid in any *Page 192 
form by the North American Trust and Banking Company for the same, and leaving, however, the contract of sale, so far as it has been executed by payment, or its equivalent, undisturbed.
The only remaining question is, whether the State of Indiana has succeeded to the rights of the Morris Canal and Banking Company in this respect. If, as it seems to have been held by the supreme court both at special and general terms, the Canal and Banking Company acted in the sale of the stocks as the agent of the State of Indiana, then, of course, the latter, as the principal, is the proper party here. But aside from this, I cannot doubt that a court of equity would hold, upon the face of the transaction, that it was the intention of the Morris Canal and Banking Company to transfer to the state its entire claim against the Trust and Banking Company, growing out of the sale of the stocks, and would, if necessary, compel any formal defects in such transfer to be supplied; and as the proceeding here is of an equitable nature, the court, upon well settled principles, will regard what ought to be done as having been done.
The judgment of the supreme court should be modified in accordance with these principles, and the proceedings remitted.
MITCHELL, J., delivered an opinion in favor of affirming the judgment of the supreme court at general term. He was of the opinion that the evidence did not establish that the Morris Canal and Banking Company, or the State of Indiana had knowledge when the bonds were sold that the Trust and Banking Company purchased them for an illegal purpose, or with intent to make an illegal use of them; and that the last named company, at the time of the purchase, in 1839, had authority to make and issue notes or certificates payable at a future day. He held, that associations organized under the general banking law were not subject to the provision contained in the safety fund act (Laws of 1829, 165, § 35), prohibiting moneyed corporations subject to the *Page 193 
provisions of that act from issuing bills or notes, payable on time; and that such associations might lawfully issue such notes for a legitimate purpose, until prohibited by the act of 1840. (Laws of 1840, 306, § 4.)
DENIO, Ch. J., was also in favor of affirming the judgment, on substantially the same grounds as those stated by Judge MITCHELL.
COMSTOCK, HUBBARD, T.A. JOHNSON and WRIGHT, Js., concurred in the foregoing opinion delivered by Judge SELDEN, and were in favor of modifying the judgment in accordance with the principles stated in that opinion.
A.S. JOHNSON, J., dissented. He was in favor of reversing the judgment rendered at general term and affirming that rendered at special term.
Judgment modified.*
* At the ensuing September term of the court the counsel for the receiver, the remittitur having been stayed, made a motion for a reargument of the foregoing case. On such motion Messrs. N. Hill, Samuel Beardsley and G.C. Bronson, of counsel for the receiver, submitted the following printed argument:
Until the decision of this case, it was supposed to be well settled that a loan of money, which the lender knows is to be applied to an illegal purpose, is an illegal contract, and that a sale of goods, which the seller has notice the purchaser intends to use in an illegal way, is also illegal; that where land is demised, knowingly to be used for an illegal purpose, the agreement for the payment of rent is illegal and void; and that the same rule applies where personal property is knowingly let to be used in violation of law. These are general rules, to some of which exceptions have been allowed by certain cases commonly known as revenue cases, which will be hereafter considered. But the authorities in favor of the general principle have been supposed to be entirely decisive. (Chit. on Contracts, 420-423, 695; McKinnell v. Robinson, 3 Mees. We's., 435; Peck v.Briggs, 3 Denio, 107; Ruckman v. Bryan, id., 340;Griffith v. Wells, id., 226; Cannan v. Bryce, 3 Barn. Ald., 179; Langton v. Hughes, 1 Maule Selw., 593;Lightfoot v. Tenant, 1 Bos. Pul., 356; Story on Confl.of Laws, 2d ed., §§ 253, 254; Talmage v. Pell, 3 Seld,
328 Bank of Michigan v. Niles, 1 Doug., Mich., 401; S.C.,Watkins' Ch., Mich. 99; The Gas Company v. Turner, 5 Bing.,N.C., 666; S.C., 6 id., 324 Cundell v. Dawson, 4 M., G. S., 376; Brown v. Duncan, 10 Barn. Cress. 93; Smith
v. Mawhood, 14 Mees. Wels., 452; White v. Buss, 3Cush., 448 Hodgson v. Temple, 5 Taunt., 181; 23 Am.Jurist, 1, and onward.)
But the opinion of the court in this case seems to be in direct conflict with the principle which has been stated; for his Honor, Judge Selden, in pronouncing that opinion, says: "It is no defence to an action brought to recover the price of goods sold that the vendor knew that they were bought for an illegal
purpose, provided it is not made a part of the contract that they shall be used for that purpose; and, provided also, that the vendor has done nothing in aid or furtherance of the unlawful design," beyond the mere sale with knowledge of the illegal intent of the purchaser.
We commenced by stating general rules of law applicable to contracts, and not exceptional cases, as smuggling contracts made in a foreign country, or domestic contracts, where property is sold to be used in violation of a mere revenue law, the sale not being expressly prohibited; and we understand Judge Selden to affirm a general principle, and not an exception to one Special contracts, like those last mentioned, if maintainable at all, must stand upon principles peculiar to themselves, but which have no application to the case in which the opinion of Judge Selden was given.
The first case referred to by his honor as an authority for his opinion, is Faikney v. Reynous (4 Burr., 2069). In that case, the plaintiff and another person had met with heavy losses in stock-jobbing transactions in which they had been jointly engaged. An act of parliament prohibited the payment of all such losses, thereby making it illegal to do so; yet the plaintiff had paid the amount thus lost, for one-half of which the defendant and another person gave the bond on which this action was brought; and it was held that the plaintiff might recover. Judge Selden says the question in that case was "somewhat analogous" to the one on which his opinion was pronounced, although he does not explain in what the analogy consists. In the case before him, the question was, whether a sale of property, knowing it was bought for an illegal purpose, was a legal contract. The purchaser, as it was assumed the seller knew, intended thereafter to "make an illegal use of the property purchased." But in Faikney v.Reynous the plaintiff had previously made the illegal payment; and the question was whether a bond, to reimburse what had already been advanced illegally, was valid.
It was not contemplated in that case that the plaintiff should thereafter make any illegal use of the money to be paid on the bond, or of any other money. He had already broken the law by making the illegal payment, and the only design of the bond was to restore to him what he had voluntarily and illegally parted with. Thus, in Faikney v. Reynous, the question was whether it was legal to engage to repay money previously advanced in violation of law; whereas in this case the question was whether an agreement to sell and transfer property, knowing it was bought to be used thereafter for an illegal purpose, was a lawful contract.
We can see no analogy between these cases, nor can we see upon what principle the judgment in the first is an authority for the last. It might be added, if that were necessary, that Faikney
v. Reynous is of no authority for any purpose, having been overruled and wholly discredited. (23 Amer. Jur., 18-21;Paley's Agency, by Dunlap, 118-120, and notes; see, at large,the article above referred to in the Amer. Jurist; Aubert v.Maze, 2 Bos. Pul., 371; Mitchell v. Cockburn, 2 Hen.Black., 379; Exparte Bell, 3 Vesey, Jun., 372; ExparteDaniels, 14 Vesey, 191; Ottley v. Brown, 1 Ball Beat.,
360; Cannan v. Bryce, 3 Barn. Ald., 179; Bensley v.Bignold, 5 Barn. Ald., 335.)
Judge Selden next refers to a class of cases which he regards as "identical in principle," — these are his words, — with the case before him; that is, Holman v. Johnson (Cowp., 341);Biggs v. Lawrence (3 Durn. East., 454); Clugas v.Penaluna (4 Durn. East., 466); Wamell v. Reed (5 Durn. East., 599) Pellicat v. Angell (2 Crompt., Mees. Ros.,
311).
These cases show that a sale of property out of England, the seller not being a British subject, is valid, although he knows that the purchaser intends to smuggle the property into England. But this, as the cases also show, is because the contract, being made in a foreign country and by a seller not a British subject, is in no sense made under or in reference to the law of England. Had the seller been a subject of the British crown, the contract, although made in a foreign country, would have been illegal, as it also would have been if made in England, whether the seller were a subject or an alien.
These foreign contracts, resting on the grounds stated, would seem to me to be in no respect "identical in principle" with domestic contracts.
The next case referred to by Judge Selden is Hodgson v.Temple (5 Taunt., 181). That was a contract made in England, under English law; and it must be admitted that the language of Sir James Mansfield, Ch. J., as there stated, is broad enough to include such a case as that in which the opinion in question was given, and if applicable to such a case, is an authority more or less controlling for that opinion. Chief Justice Mansfield is reported to have said that "the merely selling goods, knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment; but to effect that it is necessary that the vendor should be a sharer in the illegal transaction."
Now, in order to understand the true meaning of this remark, and to allow it all the force which it is justly entitled to, it is necessary to see what the case was in which it was made; for a remark, although general in its terms, must be understood as having particular reference to the subject under consideration, and cannot in reason be allowed to have a broader application. A general observation of a judge, in giving judgment, may be perfectly correct in reference to the case before him, and yet may be as clearly wrong when applied to a case of a different character, although falling within the general terms used.
The case of Hodgson v. Temple was an action to recover for spiritous liquors sold and delivered by the plaintiff to the defendant, to be used in his rectifying distillery, as the plaintiff knew. The defendant, as the plaintiff also knew, was at the same time a licensed retailer of such liquors, and as such was prohibited from being concerned in a distillery. It was argued that the plaintiff, having sold the spirits with knowledge that the purchaser intended to use them in violation of law, could not recover; and we admit that if the general rule, which disables a party from recovering for goods sold to be used illegally, applies to such a case as that was, the plaintiff was not entitled to recover, and the judgment rendered was erroneous. But this rule, although it applies universally where anything is prohibited with a view to morality or public policy, and also where the object is to protect buyers and consumers against the frauds of manufactures or sellers; yet, according to the English revenue cases, it does not apply where the design of the prohibition is merely to secure the due collection of revenue, the sale itself not being forbidden. Such was the case ofHodgson v. Temple. The sale of liquor, although the plaintiff knew it was bought to be used illegally, was not prohibited; the prohibition was, that the defendant, a retailer, should not also be a distiller. Had the sale been prohibited, it would have been illegal although the sole object in view was the collection of revenue. (Chit. on Contr., 420, 698; Cope v. Rowlands, 2Mees. Wels., 153, 157; Smith v. Mawhood, 14 Mees. Wels., 452.) But the prohibition in the case of Hodgson v.Temple being only personal to the defendant, that he, a retailer, should not be concerned in distilling, c., a sale to him of spirits, which he intended to use in violation of the prohibition, was not illegal; the object of the prohibition being merely the due collection of revenue.
The soundness of the class of cases to which Hodgson v.Temple belongs has frequently been questioned in England, and learned judges there and in this country have not hesitated to affirm that the distinction on which they proceed "cannot be maintained upon the basis of any sound and fair argument." (Territt v. Bartlett, 21 Verm., 188; Cope v. Rowlands,
2 Mees. Wels., 153, Parke, B.; Greenleaf's Overruled Cases,
64, 255; Brooker v. Wood, 3 N. Man., 96, Littledale, J.;Story's Confl. of Law, §§ 253-255.) This consideration certainly admonishes us not to treat these cases as evidence of any general rule of law applicable to illegal contracts, for that would be to bring them into direct conflict with all the cases on that subject. The truth is, they are at best exceptional cases, maintaining peculiar views as applicable to a particular class of contracts. And looking at them as decided on a principle applied to sales of property which the purchaser intends to use in violation of a mere revenue statute, it is plain that, whether sound or unsound, they can have no bearing on the present case.
The general principal which forbids a recovery by a seller, for goods sold by him with knowledge that the purchaser intends to use them illegally, is thus stated by Chief Justice Shaw, inWhite v. Buss (3 Cush., 448). He says, it is "well settled by the authorities that any promise, contract or undertaking, the performance of which would tend to promote, advance, or carry into effect an object or purpose which is unlawful, is in itself void, and will not maintain an action. The law which prohibits the end, will not lend its aid in promoting the means designed to carry it into effect; and in this respect the law gives no countenance to the old distinction between malum in se andmalum prohibitum. That which the law prohibits, either in terms or by affixing a penalty to it is unlawful, and it will not promote in one form that which it declares wrong in another."
These views are undeniably correct, unless, perhaps, where the law which a purchaser intends to violate is a prohibition, having reference merely to the collection of revenue. That exception, if allowable at all, was obviously not in the mind of the chief justice when he prepared this opinion, nor was it at all necessary to advert to it in that case. He intended to state a general principle, and did so with his accustomed clearness and force. Chitty, in stating the same principle, expressly excludes revenue prohibitions. He says, "where a statute having in view
the protection or general benefit of the public, or the prevention of a fraud, expressly or impliedly renders it illegal to make or use certain articles in a particular manner, or for certain special purposes, the price of goods sold with aknowledge of the intention to contravene the provisions of the act, and in furtherance of the illicit object, cannot be recovered." (Chit. on Contr., 422-424, Amer. ed., 1840.)
Such is the general rule. But where the design of the purchaser is to use the property bought in violation of a mere revenue prohibition, the sale, according to the English cases, is not illegal, although the seller has full notice of that illegal intent. The case of Hodgson v. Temple was of that peculiar character, and was decided on that distinction, as is fully shown by subsequent cases. (Brown v. Duncan, 10 Barn. Cres.,
93; Cope v. Rowlands, 2 Mees. Wels., 149; Wetherill v.Jones, 3 Barn. Adol., 221; Smith v. Mawhood, 14 Mees. Wels., 452; Cundell v. Dawson, 4 M., G. S., 376;Chit. on Contr., 420-423; Griffith v. Wells, 3 Denio,
226; Law v. Hudson, 11 East., 300; Wheeler v. Russell,
17 Mass., 258; Bensley v. Bignole, 5 Barn. Ald., 335;Tyson v. Thomas, McC. Y., 119; Little v. Poole, 9Barn. Cres., 192; Forster v. Taylor, 5 Barn. Adol.,
887; Johnson v. Hudson, 11 East, 180; Spurgeon v.McIlwaine, 6 Hammond, 442.)
The law intended to be violated, in the present case, had no reference to revenue, but was intended to promote sound policy and the public interest; and, therefore, as we respectfully submit, the case of Hodgson v. Temple, if rightly decided, is inapplicable as an authority.
Judge Selden, after quoting the smuggling cases already mentioned, and Hodgson v. Temple, adds: "Opposed to this series of cases, holding one uniform language and sanctioned by such names as Mansfield, Buller, Kenyon, Abinger and others, I know of but a single English case, viz., that of Langton andothers v. Hughes (1 Maule Selw., 593)", which he thinks "was not very well considered;" nor, as he remarks, does it "appear to have been followed either in England or in this country," but was "virtually overruled by the subsequent case ofPellicat v. Angell (2 Crompt., Mees. Ros., 311)." On these grounds, his honor says it "can have but little weight in opposition to the numerous authorities, to which" he had referred, going to establish the contrary principle.
That Langton v. Hughes is exactly in point to maintain the converse of the position of Judge Selden, is, in effect, conceded by him, and will fully appear by examining the case. If, as is observed by the learned judge, it has not "been followed either in England or in this country," it is, as we suppose, simply because no case precisely like it has come up for judgment. It has, as far as we know, never before been called in question, and has been over and over again referred to as sound in principle. (Cannan v. Bryce, 3 Barn. Ald., 179; The Gas LightCompany v. Turner, 5 Bing. N.C., 666; Cundell v. Dawson,
4 M., Gr. S., 376; Forster v. Taylor, 5 Barn. Adol.,
887; De Begnis v. Armistead, 10 Bing., 107; McKinnell v.Robinson, 3 Mees. Wels., 434; Peck v. Briggs, 3Denio, 107; Ruckman v. Bryan, id., 340; Ruckman v.Pitcher, 1 Comst., 409; Ex parte Bell, 1 Maule Selw.,
751; Morgan v. Groff, 5 Denio, 364; Perkins v. Savage,
15 Wend., 412; De Groot v. Van Duzer, 20 id., 396; 23Am. Jurist, 14; Haydon v. Davis, 3 McLean, 278; Story onConfl. of Laws, §§ 253-255.) How Langton v. Hughes, which was the case of a contract made in England, could have been "virtually overruled" by the case of Pellicat v. Angell,
where the contract was made out of England, and not under English law, no reference on the argument or in the decision of that case being made to the former, is what we cannot understand; nor are we able to see that the case of Langton v. Hughes is at all "in opposition" to either of the authorities referred to by Judge Selden. That it stands in direct antagonism to the position of the learned judge, is, in effect, stated in his opinion; and how far it should be regarded as a dubious case, may be determined by looking at the authorities referred to at the commencement of this review. Loans of money, sales of goods, demises of real estate and the letting of personal property, all stand on one and the same principle. If the design is known to be a violation of the law, no court of justice will aid either party.
Judge Selden next refers to a class of cases in which, as he says, "the express object of the plaintiffs," in selling the goods or lending the money, was, "that they should be used for an unlawful purpose; and that such purpose entered into andformed a part of the contract of sale or loan." Lightfoot v.Tenant (1 Bos. Pul., 551), Cannan v. Bryce (3 Barn. Ald., 179) and McKinnell v. Robinson (3 Mees. Wels.,
434), are referred to as such cases.
We are unable to see that in either of these cases the plaintiff had any such object as is imputed to him, or that it "formed a part of the contract" that the money or property should be applied to the "unlawful purpose" which the defendant had in view. It was no part of the contract of the plaintiff that the defendant should violate the law, although means were advanced and furnished, knowing that the defendant intended to use them in that way.
In Lightfoot v. Tenant, the action was on a bond given by the defendant to the plaintiff, for goods sold and delivered the plaintiff, the seller knowing that the defendant intended to dispose of them in a manner prohibited by an act of parliament. In one aspect of the case, as viewed by Chief Justice Eyre in pronouncing judgment, the plaintiff might have been interested in the ultimate illegal use to be made of the property, which would certainly have been a fatal objection to a recovery. But the case was not determined on this ground alone, for it was held to be a good defence to the action, if the goods were sold "to thedefendant for the purpose of enabling him" to dispose of them illegally. The defendant bought them for such a purpose, as the plaintiff knew, but it formed "no part of the contract" that they should be so used by the defendant.
In Cannan v. Bryce, the plaintiff lent money to the defendant to enable him to pay stockjobbing losses, such payments being prohibited by statute. This loan was held to be illegal, because the plaintiff knew that the money was obtained to be applied to this illegal purpose, and not because it was "part ofthe contract" that it should be so applied. It is unnecessary to speak particularly of the case of McKinnell v. Robinson. It affirms, as the others do, that a loan or sale to a party for the purpose of enabling him to accomplish an illegal object, is itself illegal. Neither of these cases, as we read them, countenances the suggestion that the loan or sale is only illegal when the lender or seller makes it "a part of the contract" that what is lent or sold shall be used or applied illegally.
In the case of Talmage v. Pell (3 Seld., 328), referred to by Judge Selden, it is true that it was made a part of the contract that the stocks should be sold. That, certainly, did not make the sale an innocent one; it was, no doubt, illegal with that ingredient in it; and the case does not intimate that, but for this stipulation, the sale would have been legal. It was argued, on the sole ground that bare knowledge of the illegal purposes in making the purchase of the stocks, made the sale illegal, and we suppose the court intended so to hold, without qualification or restriction. The court did not suggest that the sale would have been legal, but for the agreement that the stocks should be sold, nor was any such distinction taken by counsel on the argument.
We have now adverted to all the cases on which Judge Selden rests his opinion on the point referred to; and we respectfully submit that they wholly fail to sustain it. We therefore dismiss this point and proceed to an examination of other parts of the opinion.
Where a statute, violated by an illegal contract, was made for the protection of a particular class of persons against another, one of the parties to the contract falling within the class intended to be protected by the statute, there, although both concur in the violation, yet the party entitled to protection may disaffirm the contract, and recover for what he has paid or advanced on it; and this, although no statute in terms gives to him such a right of action.
This is on the supposition that he may have been oppressed, deluded or imposed on by the other party to the contract, and is therefore, entitled to redress. Such is the theory as to statutes of this character; and the same relief, under like circumstances of oppression, imposition, hardship or undue influence, may be given by the common law; for, where "one holds the rod and the other bows to it," the parties cannot be in pari delicto. (Smith on Contracts, 189, 190; 2 Comyn on Contracts, 113, 117, 119; Schroeppel v. Corning, 2 Denio, 236; Smith v.Bromley, 2 Doug., 670; Howson v. Hancock, 8 Durnf. Fast, 577; Jacques v. Golightly, 2 Wm. Bl., 1073;Browning v. Morris, Cowp., 790; Williams v. Hedley, 8East, 378; Thistlewood v. Cracroft, 1 Maule Selw., 500;Jaques v. Withy, 1 Hen. Bl., 65; Mount v. Waite, 7John., 434; Smith v. Cuff, 6 Maule Selw., 160; Chit.on Contracts, 634, 635; Addison on Contracts, 235, 236;Broom's Legal Maxims, 327; Osborne v. Williams, 18 Ves.,
279; Reynell v. Sprye, 13 East's Law and Eq. R., 74;Story's Eq. Jurisprudence, § 300.)
We do not assert positively that the principle last stated will aid a party to a contract which violates the common law, although we suppose it will. But it is unnecessary to consider that question. That the principle applies universally, where the statute violated was made for the protection of one class of persons against another, would seem, upon the authorities, to be incontrovertible. Lord Mansfield said, in the case of Clark v.Shee (Cowp., 197): "There are two sorts of prohibitions created by positive law in respect to contracts. 1st. To prevent weak or necessitous men from being overreached, defrauded or oppressed. There the rule in pari delicto, potior est conditiodefendentis, does not hold; and an action will lie, because where the defendant imposes upon the plaintiff it is not pardelictum. * * * * * The next sort of prohibition is founded upon general reasons of policy and public expediency. There both parties offending are equally guilty, par est delictum, etpotior est conditio defendentis."
Where a prohibition of the first sort, looking to the classification of Lord Mansfield, is violated, the party imposed upon is relieved, because not in pari delicto with the other. It would be bootless to inquire whether one who is induced by weakness or imposition, or coerced by his necessities, to concur in an act which violates the law, is at all in fault. Lord Chancellor Talbot held the negative on this question (Bosanquett v. Dashwood, Tal. Ca. in Eq., 37), and he does not stand alone in that opinion. The common phrase, however, is, that the party of whose condition advantage is taken, although himself not wholly faultless, is not in equal delictum with the other. The distinction may not be practically of any moment, for where the statute violated was made for the protection of one class against another, the former is entitled to be relieved, as, in every view of the question, not involved in equal guilt with the latter. And, so far as respects the violators of statute law, this, as we understand it, is the length and breadth of the principle, assuming that there is no provision which, in terms, authorizes one offender to recover of another. For the correctness of this position the authorities referred to above may, as we think, be safely appealed to.
But Judge Selden has taken a different view of this question in the opinion under consideration. The facts on which this opinion was given, so far as is material to a right understanding of the question, were these: the Morris Canal and Banking Company agreed to sell stocks of the State of Indiana to the North AmericanTrust and Banking Company, for which the latter were to give their negotiable certificates of deposit, payable at future periods; and the stocks and certificates were delivered by the respective parties according to their engagements. This contract was held by the learned judge to be illegal, in which the court must have concurred with him, for the judgment rendered was not that a recovery could be had to the amount agreed by the special contract of sale, but that contract being illegal, it was adjudged the law would imply a promise to pay the value of the stocks at the time of their sale and delivery, and to that extent the seller might recover. As the general position, that an action will not lie for money or property paid or delivered on an illegal contract, was conceded, the court must have found it necessary, in order to arrive at the above conclusion, to discover some principle which would take this advance of stocks on the illegal contract out of the well established rule of law which has just been stated. And that principle, according to the opinion, was, that The Morris Canal and Banking Company, in selling the stock, was less guilty than the Trust and BankingCompany was in buying them.
The precise ground on which the court adjudged the contract for the sale and delivery of the stocks to be illegal, may, perhaps, be left in some doubt; but we understand Judge Selden and the court to hold that the Trust and Banking Company had no legal right to issue such certificates of deposit as were agreed to be received for the stocks sold, and, therefore, the contract of sale was illegal; as it also was, because the certificates would be and were when issued, a violation of the restraining law; which, according to the opinion, imposes a penalty only on the party issuing illegal paper, and not on one who procures such paper to be issued. The statute, as was said, thus marked theTrust and Banking Company as the chief offender; and TheMorris Canal and Banking Company, not being in pari delicto,
though unable to enforce the express contract, might recover on an implied one.
In the course of his opinion, Judge Selden says: "The cases in which the courts will give relief to one of the parties, on the ground that he is not in pari delicto, form an independent class, entirely distinct from those cases which rest upon a disaffirmance of the contract before it was executed. It is essential to both classes that the contract be merely malumprohibitum. If malum in se, the courts will in no case interfere to release either party from any of its consequences. But where the contract neither involves moral turpitude nor violates any general principle of public policy, and money or property has been advanced upon it, relief will be granted to the party making the advance: 1. Where he is not in pari delicto;
or, 2. In some cases where he elects to disaffirm the contract while it remains executory."
The opinion then sets out what was said by Lord Mansfield, in the case of Smith v. Bromley (Doug., 670, note), to wit: "If the act is in itself immoral, or a violation of thegeneral laws of public policy, then the party paying shall not have this action; for when both parties are equally criminalagainst such general laws, the rule is portior est conditiodefendentis. But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, c. If such laws are violated, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover and it is astonishing that the reports do not distinguish between violations of the one and the other."
Upon this Judge Selden remarks: "Two things are to be noted in this extract; that a distinction is taken between contractsmalum prohibitum merely, and such as are immoral or contrary to general principles of policy; and, also, that stress is laid upon the fact that the law contravened in this case was intended toprotect one party from oppression by the other." And the learned judge then adds: "The first is a valid distinction, which runs through all the subsequent cases; the last was merely incidental to the particular case and not essential to theprinciple." The opinion then proceeds: "The first cases in whichthe principle was applied, were naturally those where the statute violated was intended for the special protection of the party seeking relief from some undue advantage taken by the other; because those were the cases in which the injustice of applying the same rule to both parties would be the most glaring.But it soon came to be seen that the principle was equallyapplicable to cases where the law infringed was intended for theprotection of the public in general."
After reviewing several cases, which will presently be noticed, the learned judge says: "The rule laid down in those cases, fordetermining which is the more guilty party, is directly applicable to the present case, so far as the transaction is held to fall within the provisions of the restraining act. It has been conceded, and was contended by the counsel for the receiver upon the argument, that the issuing of the certificates in this case was a violation of §§ 3, 6 and 7 of the act concerning unauthorized banking. (1 R.S., 712.) It will be seen, by referring to those sections, that the penalties are imposedexclusively upon the corporation violating the provisions of the act, and upon its officers and members. So far, therefore, as the defence is based upon a violation of the restraining act, there is that statutory designation of the guilty party upon which most of the cases to which I have referred are made to rest. But it is obvious that the general principle for which I contend applies equally to that branch of the defence which rests upon the ground that the act of the Banking Company in issuing the notes was ultra vires, and against public policy. The imposition of the penalties, for a violation of the restraining law, upon the corporation alone, does not make it the guilty party, but is simply evidence that the legislature so regardedit; and the reasons are equally strong for fixing the principal guilt upon the same party, where its acts merely violate the principles of the public policy. Although persons dealing with corporations are, for certain purposes, presumed to know the extent of their corporate powers, yet this is by no means a safe rule by which to measure the moral delinquency of the respective parties."
"To me, therefore, it seems plain, that whether we regard the act of the Trust and Banking Company, in issuing the certificates in question, as a violation of the restraining law, or as simply ultra vires, or as against public policy, the corporation is to be regarded as comparatively the guiltyparty."
These extracts indicate the grounds on which it was held thatThe Morris Canal Company had a good right of action against theTrust and Banking Company upon an implied promise to pay for the stocks sold and delivered on this illegal contract. And we understand the opinion as maintaining: 1. That the restraining law proves, by imposing a penalty on the Trust and BankingCompany alone, that it was "comparatively the guilty party," and, therefore, The Morris Canal and Banking Company not being in pari delicto, might rcover; 2. That whether the sale was simply ultra vires, or positively illegal, The Morris CanalCompany could not enforce the express contract, yet the law would imply a promise in its favor to pay for the stocks sold, and on this a recovery might be had.
Judge Selden seems to hold that it is "not essential to theprinciple" on which relief may be granted to a party who violates a statute, that the statute should have been made for his protection; but in this, we think, with great respect, he is mistaken. If the violated statute has in view the promotion of sound public policy, all who voluntarily break it are particepscriminis and equally guilty, and it is only when the statute was made to protect one class against another, that the former can set up that they are not in pari delicto, and on that ground claim exemption from the ordinary consequences of their own acts. We cannot say, in the words of Judge Selden, that this is "notessential to the principle" on which a party may be relieved, for it is, as we understand the law, the very principle itself.
We now propose to show: 1. That the restraining law makes persons, natural or artificial, who procure paper to be issued in violation of its provisions, equally guilty with the corporation or individual issuing such paper; 2. That where a statute is violated by several persons, natural or artificial, neither can be relieved or aided on the ground that he is notpari delicto, unless the statute was made for his protection.First, as to the Restraining Law (1 R.S., 712): The 3d section of this statute is as follows: "No incorporated company, without being authorized by law, shall employ any part of its effects, or be in any way interested in any fund that shall be employed, for the purpose of receiving deposits, making discounts, or issuing notes or other evidences of debt, to be loaned or put into circulation as money."
The 4th section is in these words: "Any director or otheragent or officer, of any incorporated company, who shall violate any provision of the last section, shall forfeit one thousand dollars."
Here, it is plain, the penalty is imposed on directors and other agents or officers of incorporated companies only, and not on any other person who may be a party to the prohibited act; but the 7th section, under which the present question arises, is of a different character, and inflicts a penalty not only on those who violate the prohibitions in the 6th section, but also on all who "assent to such violation."
The 6th section declares that "No person, association of persons or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits, or discounting notes or bills or issuing any evidences of debt, to be loaned or put in circulation as money, nor shall they issue any bills or promissory notes or other evidences of debt as private bankers, for the purpose of loaning them or putting them in circulation as money, unless thereto specially authorized by law."
The 7th section is, that "Every person and every corporation, and every member of a corporation, who shall contravene either of the provisions in the last section, or directly or indirectly,assent to such violation, shall forfeit one thousand dollars."
Now, without the slighest reference to these penal provisions, it must be illegal to do, or procure to be done, what is thus prohibited. It is a principle, not less of criminal than of civil law, that one who procures, by request or direction, an illegal act to be done, is himself a guilty violator of the law, precisely as much so as the one who does the prohibited act. It might justly be deemed offensive, as implying gross ignorance on the part of the tribunal addressed, to cite authorities for a principle so plain and universal in its application, and none are referred to. If the penal sections were therefore expunged from the statute, the acts prohibited would be, when done, precisely as illegal as they now are; and to procure the issue of paper in violation of the provisions of the 6th section, would be exactly as illegal as actually to issue such paper. Penal sections add nothing to the illegality of what is prohibited, but only provide a mode of punishing guilty parties, some or all of them, in addition to the ordinary consequences of such acts. Where there is no express prohibition of an act, but a penalty is imposed for doing it, the penalty implies a prohibition; but if the statute contains a prohibitory as well as a penal clause, there is no occasion to look at the latter to determine that those who do, or aid in doing, what is prohibited, violate the law.
Thus, as to the restraining law, the issue of paper of a certain description being expressly prohibited by the 6th section, it must, on general principles, be illegal to procure such paper to be issued, whether the act imposes a penalty on such procurer or not. It seems to us, therefore, to be quite immaterial whether a penalty is incurred by procuring the issue of paper in violation of the restraining law or not, for the inquiry is, not whether a penalty is imposed on such procurer, but whether it is illegal to procure such paper to be issued.
Still, we see no room to doubt that procuring the issue of such paper is a penal offence. The case falls within the 6th section of the restraining law, which, as we have seen, declares, amongst other things, that "no person, association of persons, or body politic, except," c., "shall issue any bills or promissory notes, or other evidence of debt as private bankers, for the purpose," c. Then follows § 7, which declares that "everyperson and every corporation, and every member of a corporation, who shall contravene either of the provisions in the last section, or directly or indirectly assent to such violation, shall forfeit one thousand dollars."
One who does the act of issuing paper in violation of the 6th section, "contravenes" what is prohibited; and one who procures such paper to be issued for his own use certainly assents to such violation, and therefore incurs the penalty imposed by the 7th section. By this section, a penalty may be incurred not only by contravening the 6th section, but by assenting thereto, and the persons who may thus violate the law are not merely the corporation and its members, but "every" other person. What then is there in the restraining law to show that the party who issues illegal paper is more guilty than one who procures it to be issued? And in reason, why should he be?
The rule laid down in the opinion, that the imposition of a penalty on one of the parties only to an illegal act marks the offender, and shows that the other is not in pari delicto, if there be such a rule, can have no application to the 7th section of the restraining law, for by that the penalty is imposed alike on each party. That one who procures paper to be issued in violation of that law is in equal guilt with the corporation issuing such paper, was expressly held by Judge Denio, in the case of Schermerhorn v. The American Life Ins. and Trust Co.,
decided by this court in March, 1856.
The case of De Groot v. Van Duzer (20 Wend, 390) goes even beyond this in support of the principle for which we contend. There it was held by the court of last resort, that Van Duzer could not recover on a contract made to facilitate a violation of the 6th section of the restraining law by a foreign bank, though he had not dealt directly with the bank, but with a party still more remote from the statute prohibition. The case proves that both parties were guilty violators of the prohibition, and it cannot stand if the rule adopted by Judge Selden is maintained.
The rule, moreover, stands in direct opposition to the case ofLearitt v. Palmer (3 Comst., 19), decided by this court. In that case, a trust was created by the North American Trust andBanking Company, to secure the payment of certain promissory notes issued by it in November, 1840, to the Palmers of London. The bill was filed in that case by the receiver of the company, to set aside this trust as illegal, and to compel the Palmers to account for what they had received under it. It was held by the court of appeals, that the trust was illegal and void, because made to secure notes issued in violation of the act of May 14, 1840, and the Palmers were required by the judgment to account for and pay over to the receiver what they had received under the trust. The act which made these notes, and consequently the trust to secure them, illegal (Laws of 1840, 306, § 4), prohibits the issue of such paper by banking associations or individual bankers, as such, and declares that "every violation of this section by any officer or member of a banking assciation, or by an individual banker, shall be deemed and adjudged a misdemeanor, punishable by fine or imprisonment, or both." No penalty, it will be observed, is imposed on the person who procures the illegal paper to be issued; yet the court held as to the Palmers — for whose benefit the notes were made — as well as against the bank, that the notes and trust were illegal, and required the Palmers to account for what they had received under the trust towards payment of the notes. They were not allowed to retain what had been paid to them, on the ground that the statute, by making the issue of such notes a misdemeanor on the part of the officers and members of the bank, had marked them as the principal offenders, and left the Palmers, who had procured the issue of the illegal paper for their benefit, wholly unaffected by this violation of the statute. According to the opinion of Judge Selden, the Palmers were not in pari delicto with the bank, but the court were of a different opinion in that case, and held the notes and trust illegal, not only as to the bank, but also as to the Palmers, and compelled them to refund what had been paid over to them under the trust.
But we proceed to our second point, stated above, which is: that where a statute is violated, no one who is a violator can be relieved or aided, on the ground that he is not in paridelicto, unless the statute was made for his protection. If the rule is thus limited, as we suppose it is, it can have no application to this case; nor will the imposition of a penalty on one party alone show that he is the greater offender.
It is possible that a statute, with or without a penalty, may be framed so as to declare in terms, or effect, that one of two parties to an act, which it prohibits, is alone guilty; though instances of this nature must be rare, especially as to statutes passed for the benefit of the public in general. Such a statute must be regarded as an anomaly in legislation; for while it prohibits the doing of an act, because contrary to the public interest, it tenders absolute immunity to all who cause it to be done. Nay, it goes further. It encourages persons to cause the act to be done, by declaring them innocent, and telling them that though they may not gain by their conduct they shall in no event lose by it. Still, we admit the legislature have power to do this; and the question is, whether they have exercised it by the statutes on which we rely.
It was insisted on the argument of the case in which the opinion of Judge Selden was given, that the contract in question, in that case, was illegal on several grounds; and, amongst others, the following, to wit: 1. Because the certificates, agreed by said contract to be received for the stocks sold, would be, and were when issued, a violation of the restraining law (1R.S., 612); 2. That said certificates were, as to the Trustand Banking Company, ultra vires, and therefore illegal; 3. That, being ultra vires, the certificates were expressly prohibited by 1 R.S., 600, § 3; 4. That they were also prohibited by the safety fund act of 1829. (Laws of 1829, 167, §§ 1, 35.)
It is obvious that these statutes were passed for public purposes and objects, if any statutes ever were, and not with a view to the protection of any particular class of persons against others; and, therefore, acts in contravention of them can on no principle be held illegal as to one party and legal as to the other.
We will now examine the cases referred to by Judge Selden, to maintain his opinion on the point under consideration; but which, as we understand them, do not sustain that opinion. Indeed, as we read these cases, they show conclusively that where two persons concur in the violation of a statute, neither can have relief as against the other, where the statute does not in terms authorize such relief; unless the statute violated was designed for the protection of the one seeking relief as against the other. We do not, of course, refer to instances where a party is compelled, by positive force, to do an act which violates the law, but to those where there is a moral coercion; as in agreeing to pay usury, which the statute for this purpose regards as equivalent to coercion by absolute force.
The first of these cases is Jaques v. Golightly (2 Wm.Bl., 1073), which was decided by the English court of common pleas, in 1776. The Reports of Sir William Blackstone were published from his notes of cases in 1781, after his decease. They are, in general, but meager statements of facts and reasons, and the report of this case is by no means an exception. The case was this: It was an action to recover money which the plaintiff had paid to the defendant for insuring lottery tickets; and, also, money won by the plaintiff on the contract of insurance, some of said tickets having been successful. The insurance of lottery tickets was forbidden by act of parliament. The court held that the plaintiff could not recover on the contract of insurance, as that was illegal, but that he could recover the amount paid by way of premium for making the insurance. Judge Selden understands this case to have been decided on the ground that the statute which prohibited these insurance contracts imposed a penalty on the insurer only; from which he deduces the principle that where a penalty is imposed on one party alone, the other is not in pari delicto with him. The report of Sir William Blackstone does not show very plainly the principle on which the case was decided; although, in giving his own opinion (for he was one of the judges), he glanced at it, in his remark that "on the part of the insured, the contract on which he has paid his money is not criminal, but merely void; and, therefore, having advanced his premium without any consideration, he is entitled to recover it back." This is well enough as far as it goes, but still it does not explain why the contract was not criminal on the part of the insured as well as the insurer; nor can that be clearly ascertained from any part of the report of the case. Fortunately, however, there is no doubt on the point, if we can rely on what was said by Lord Mansfield, in 1778, two years after the case of Jaques v. Golightly had been decided. In giving judgment in that year, in the case of Browning v.Morris (Cowp., 793), Lord Mansfield said: "This brings the present case within the determination of Jaques v. Golightly. For in that case the chief justice said: `The statute is made toprotect the ignorant and deluded multitude, who, in hopes of gain and prizes, and not conversant in calculations, are drawnin by the office keepers.'" This cannot be mistaken; it shows plainly why the advance of money on the contract was not criminal on the part of the insured; for the statute was made to protect him from being imposed upon by the insurer. The case has ever since been regarded as an authority for this principle, and for nothing else.
Judge Selden refers to Jaques v. Withy (1 Hen. Bl., 65), decided by the English common pleas, in 1788. It was an action brought to recover back money paid for insuring lottery tickets; was argued, on the ground that the statute was made to protect the assured, and, therefore, he was not in pari delicto with the insurer. The court so held, and the plaintiff recovered. Judge Selden says that this, and Jaques v. Golightly, are not cases "where an undue advantage was taken of the peculiar situation of the" plaintiffs. But Lord Ellenborough thought otherwise, for in Thistlewood v. Cracroft (1 Maule Selw.,
500), decided in 1813, in speaking of these cases he remarked: "The statute was considered as intended to protect the individual, and to mark the lottery office keeper asstigmaticus, the one being likely to be oppressed or imposed upon by the other; and on that view of the statute thosedecisions turned."
The case of Williams v. Hedley (8 East, 378) is referred to by Judge Selden. The defendant, Hedley, had previously brought a qui tam action for usury against the plaintiff, Williams, which they agreed to compromise and settle, Williams paying, to effect that object, a large sum of money. He brought this action to recover that money back, and it was objected that he was aparticeps criminis in pari delicto, with the defendant Hedley, in making the compromise, and, therefore, could not recover. But the court held that the statute, which prohibited the compromise of penal actions, was confined to the informer or plaintiff therein, and did not extend to the defendant; that it was meant to restrain and punish the one who sues, who might do so in order to extort money, and not the party who might be the object of such extortion. This, Lord Ellenborough said, "appears to have been the true sense and intention of the legislature." In answer to the objection, that although the defendant in the penal suit might not be within the terms of the statute, yet he concurred in and was a party to the act by which the statute was violated, and that the law would not aid him, Lord Ellenborough observed, that this rule applies "if the act be in itself immoral, or a violation of the general laws of public policy; yet in the case of other laws, which are calculated for theprotection of the subject against oppression, extortion anddeceit, Lord Mansfield lays down, that if such laws be violated, and the defendant take advantage of the plaintiff's condition or situation, then the plaintiff shall recover." And in applying this principle to the case before the court, Lord Ellenborough said: "In respect to the criminal offence of compounding, the plaintiff, Williams, was the person whosesituation was taken advantage of by the other party to thecomposition; the provision of law was made to protect parties in the condition of Williams, and he can recover."
Judge Selden says: "These are the leading English cases on the subject; and it is plain that they do not rest-solely upon the ground that the statute infringed was intended to protect one party from acts of oppression or extortion by the other." We cannot see this as his Honor does, for we understand these cases as resting "solely" on the ground just stated. Indeed, where two persons voluntarily concur in an act which violates a statute, why are they not in pari delicto, unless the statute was intended to protect one as against the other?
We agree with Judge Selden that these cases have never been overruled, and that, as we understand them, they have been expressly sanctioned and approved by American cases. TheInhabitants of Worcester v. Eaton (11 Mass. 368) is such a case.
Judge Selden mentions the case of White v. Franklin Bank
(22 Pick., 181), and says: "It is impossible, as it seems to me, to distinguish this case in principle from that now before the court." Again, "it belongs clearly to the same class with the English cases just reviewed."
Let us see what this case was. It was an action brought on the 7th of July, 1837, to recover $2000, deposited by the plaintiff with the defendant on the 10th of February in that year, and for which the defendant gave a written agreement to repay the money on the 10th of August then next. A statute of Massachusetts prohibited banks from making any contract "for the payment of money at a future day certain," under penalty of a forfeiture of their charter. It was objected that the plaintiff, having advanced the money upon an illegal contract, could not recover it back.
There is one feature of this case which alone ought to detract from its weight as an authority. The court were evidently unable to find a precise principle on which to place their decision, and therefore adverted to various grounds. Among these are the following: 1. That the statute treated the act of deposit as perfectly legal, and only prohibited the issuing of the certificate by the bank. (22 Pick., 183, Shaw, Ch. J.; id.,
185, Wilde, J.) 2. That therefore its prohibitions were leveled particularly against the bank, and the act of the depositor was not prohibited. (22 Pick., 188.) 3. That as the contract wasmalum prohibitum merely, not malum in se, the depositor might recover. (22 Pick., 185.) Another view was adverted to, viz., that the contract remained executory, and the depositor, even if guilty, was entitled to his locus penitentiæ and to sue in disaffirmance. But the court finally declined to place their decision on this ground, and expressly disclaimed it. (22Pick., 189, 190.)
It is manifest, therefore, in disposing of the case, the court reposed themselves mainly, if not entirely, upon the interpretation of the statute, which they understood to mean that the act of the depositor in contracting for and taking the certificate was in no sense illegal, though the bank was prohibited from giving it. If the statute said this, or if such was its true meaning, the decision does not stand in our way. And if the court erred in the construction of the statute, the result is the same. But if the decision is understood as affirming, that where a statute is passed for public purposes and objects, persons may lawfully tempt others to violate it, simply because its penalty is imposed on the latter alone, it is directly contrary to the general rule established by numerous cases, and by this court in the case of Leavitt v. Palmer.
The case of Atlas Bank v. Nahant Bank (3 Metc., 581) is precisely like the one last above, and calls for no further notice.
The case of Lowell v. Boston and Lowell Railroad Company
(23 Pick., 24) is also one of the cases referred to by Judge Selden. It was the duty of the plaintiff (the town of Lowell) to keep a highway in repair, so as not to be dangerous to those who might have occasion to use it. The plaintiff had caused proper barriers for this purpose to be placed in the highway, but they were removed by the defendants, in consequence of which two persons were injured, who sued and recovered damages of the plaintiff. Upon these facts it was very properly held, that the plaintiff, not being in pari delicto with the defendants, might recover the damages thus sustained by the town.
The only other case referred to by Judge Selden, on this subject, is Mount v. White (7 John., 434), which was precisely like the cases of Jaques v. Golightly, and Jaques
v. Withy, and was decided, as they were, on the ground that the statute was intended to protect the plaintiff.
We here close our review of the opinion of the court, and we must say we are wholly unable to perceive that cases founded on statutes made for the protection of one class of persons against the fraud, oppression or chicanery of another, have any application to such a case as the one on which that opinion was given; or that they tend to prove The Morris Canal Company not to have been in pari delicto with the Trust and Banking Company.
Our object has been to show, and, with great respect, we think we have shown, that the opinion is erroneous in these particulars: 1. In holding that a sale of personal property is legal, although the seller has notice that the purchase is made with intent to make any illegal use of the property; and that the sale is illegal only when it is made a part of the contract that the property shall be applied to an illegal purpose; 2. In holding that the 7th section of the restraining law does not inflict a penalty on those who procure paper to be issued in violation of the 6th section, but only on the party who actually issues such paper; 3. In holding that the imposition of a penalty, on part only of those who violate a statute, makes or proves those who are subject to the penalty greater offenders than the others, and that the latter, although themselves guilty violators of the law, may have redress against the former; 4. In holding that the Morris Canal and Banking Company was not, in the illegal sale and delivery of state stocks to the North American Trust and Banking Company, in pari delicto with the latter.
A. Mann argued the motion for the State of Indiana.
COMSTOCK, J. This case having been decided at the last June term, the defendants' counsel now move for a rehearing, alleging that the court, through a misapprehension of the authorities cited in the opinion of Judge Selden, has fallen into manifest error in its decision. A review of that decision is therefore urged, not only as an act of justice to the parties, but also from a very commendable regard for the law itself. In the variety and multiplicity of questions which engage the attention of this court, many of them difficult and complicated, it can hardly fail to happen that inadvertence and misapprehension will sometimes occur. When such is the case, it is plainly the duty, as I doubt not it will always be the pleasure, of the court to retrace its steps and correct the errors it may have committed, so long as the questions decided are open for consideration.
In the opinion of Judge Selden, which received our assent when the judgment was pronounced, the doctrine is laid down, that in an action to recover the price of goods sold, it is no defence that the vendor knew they were bought for an illegal purpose, provided it was not made a part of the contract that they should be used for that purpose, and, provided also, that the vendor had done nothing in aid or furtherance of the unlawful design beyond the mere sale with knowledge of the intent of the purchaser. In the elaborate criticism of the defendants' counsel upon this doctrine, it is insisted that the authorities cited to sustain it, instead of establishing a general principle, are mere exceptions, depending on the nature of the laws violated and the circumstances under which the contracts of sale were made. It becomes proper, therefore, to analyze these authorities, at least the leading ones, with more care than was deemed necessary on the former occasion.
The leading case, in England, is that of Holman v. Johnson
(Cowp., 341). In that case the contract of sale was made in France, by a citizen residing there. The purchaser intended to smuggle the goods into England, in violation of the revenue laws of that kingdom; but, as the case states, "the seller had no concern in the smuggling scheme itself, but merely sold the tea to the defendant, as he would have done to any other person in the common and ordinary course of trade." In deciding the case, Lord Mansfield referred to the circumstance of the contract being made abroad, as of some importance; but the reason why he so regarded it, has, I think, been misunderstood in some of the later cases, as well as by the counsel for the receiver in the one now under consideration. Goods smuggled into England could not be sold at all. So I infer from the remark of Lord Mansfield. He said: "In England, tea which has not paid duty, is prohibited, and if sold there the contract is null and void; but if sold and delivered at a place where it is not prohibited, as at Dunkirk, and an action is brought for the price of it in England, the buyer should be condemned to pay the price, because the original contract was good and valid." To maintain the action, it was indispensable to show that the goods could be the subject of a lawful sale between the parties; but as they had not paid duty, they could only be lawfully sold out of England. The situation of the goods and the place of the contract were therefore important, but only to establish the general legality of the transaction. That being settled, the turning point of the case was, that the plaintiff, although he knew of the purchaser's intention to smuggle the tea into England, did nothing either in the terms of the contract or otherwise in furtherance of that intent. This is quite evident from the following language of the lord chief justice: "Is there any law of England," he inquired, "transgressed by a person making a complete sale of a parcel of goods at Dunkirk and giving credit for them? The contract iscomplete, and nothing is left to be done. The seller, indeed, knows what the buyer is going to do with the goods, but has noconcern in the transaction itself. It is not a bargain to be paid in case the vendee should succeed in landing the goods, but the interest of the vendor is totally at an end, and his contract complete by the delivery of the goods at Dunkirk."
I am greatly mistaken if this reasoning does not rest entirely upon the fact that the contract of sale had no connection with the subsequent destination of the goods. Its force is not in the least degree impaired, if the words "at Dunkirk" are expunged from the passage quoted. To apply the argument to the facts of the present case: it was lawful, in general, for The Morris Canal and Banking Company to sell Indiana state stocks to the North American Trust and Banking Company, although unlawful for the latter to use the stocks in a particular way. With the unauthorized or illegal design, The Morris Company had nothing to do. The sale itself was complete, irrespective of that design, and the transaction between the parties closed. I have no hesitation in saying, that the case of Holman v. Johnson has not been misapprehended, and that the present one falls precisely within the doctrine there laid down.
In the case of Biggs v. Lawrence (3 Term R., 454), the plaintiffs were four partners, three of whom resided in England, and one in Guernsey. The action was for goods sold in Guernsey, to be smuggled. It was admitted that the question must be considered as though all the plaintiffs had resided in England. In determining that the action would not lie, some of the judges thought that circumstance important, as distinguishing the case from Holman v. Johnson, evidently misapprehending the reasoning of Lord Mansfield; but they all laid peculiar stress upon the manner in which the goods were packed, evincing a design, as was said, on the part of the sellers, to aid the buyer in smuggling them into England. Ashhurst, J., observed, "the plaintiffs were agents in the very act of smuggling." Buller, J., said, "it is clear, from the manner in which they were packed, that they were intended to be smuggled; that was the actof the plaintiff." The case, in short, clearly recognizes the distinction between mere knowledge, on the part of the vendor, of the illegal intent of the purchaser, and the doing of some act to further that intent.
The subsequent cases of Clugas v. Penaluna (4 Term, 466), and Waymell v. Reed (5 id., 599), still more clearly recognize the same distinction, and in them the distinction is not obscured by any misapprehension of the decision of Lord Mansfield. In both those cases, that decision was regarded as proceeding on the ground merely that the sale itself being a lawful contract, mere knowledge of the buyer's intention to smuggle the goods did not prevent a recovery of the price. But there is a further significance in these two cases. They necessarily repudiate the notion that the foreign residence of the seller or the place of the contract has anything to do with the question. In one of them (Clugas v. Penaluna), the vendor resided in Guernsey, and was not affected by the revenue laws of England, and on that ground it was sought to distinguish the case from Biggs v. Lawrence (supra). In the other (Waymell v.Reed), the vendor was a foreigner residing at Lisle. In both the cases, it was held the plaintiff could not recover the price of the goods, because, in addition to the mere sale, with the knowledge of the intent to smuggle, they had done some act to aid in the execution of that intent. Now, if the foreign residence of the vendor, or the place of the contract, or even the character of the laws infringed, as mere revenue statutes, were the turning point in cases of this description, it is entirely plain that the actions would have been sustained; for in the one case, the inhabitant of Guernsey, although a subject of England, was not reached by its statutes against smuggling, while, in the other, the plaintiff was a resident of France; in both, the contracts of sale were lawful at the place where they were made, and in both the laws intended to be violated by the purchaser were revenue laws merely. These distinctions were therefore emphatically repudiated, while that of Lord Mansfield, in Holman v.Johnson, was distinctly recognized and admitted.
The next case in the series is that of Hodgson v. Temple (5Taunt., 181), where the goods were sold, and the plaintiff resided in London. It became, therefore, necessary to look at the question divested of the extraneous circumstances which had attended the previous cases, and the main point now in controversy was met and decided in terms as explicit as the English language affords. The court in that case ceased to advert to the distinctions between contracts made abroad and in England, and between a design to violate a revenue law and any other law, but asserted broadly the doctrine we held in the present case, that mere knowledge on the part of the vendor of goods, that the buyer intends to use them for an illegal purpose, will not defeat a recovery for the purchase money. The effort which has been made to escape the force of this decision, by putting it on some other ground, has been quite unsuccessful.
The latest of the English cases cited by Judge Selden isPellicatt v. Angell (2 Cromp., Mees. Ros., 311). Although in this case, as in that of Holman v. Johnson, the sale of the goods was made in France by a foreigner residing there, and although this circumstance is alluded to by the chief baron, it was not the ground of the decision. Lord Abinger said: "The plaintiff sold the goods; the defendant might smuggle them if he liked, or he might change his mind the next day; it does not at all import a contract, of which the smuggling was to be an essential part." Baron Bolland said: "I think the distinction pointed out by the chief baron, between merely knowing of the illegal purpose, and being a party to it by some act, is the true one;" and Alderson, B., said: "The mere sale to a party, although he may intend to commit an illegal act, is no breach of the law." These remarks clearly had no reference to the nature of the law intended to be violated, or to the place of the contract. They are unintelligible, unless they assert the doctrine we have laid down in this case.
It will, perhaps, be still more apparent that we have not misapprehended these authorities, if we now refer to one or two others not cited on the previous occasion. In Bowry v.Bennett (1 Campb., 348), the action was brought to recover the price of certain clothes sold to the defendant, and the defence was that the defendant was a woman of the town; that this was well known to the plaintiff, and that the clothes were purchased to enable the defendant to carry on the business of prostitution. Lord Ellenborough held, at nisi prius, that "it must be shown not only that the plaintiff had notice, but that he expected to be paid from the profits of the defendant's prostitution, and that he sold the clothes to enable her to carry it on, so that he might appear to have done something infurtherance of it." It would be difficult to distinguish the principle here enunciated from that adopted by this court.
The precise question under consideration has arisen and been determined in the same way by one of the American courts, whose decisions are entitled to no inconsiderable weight. In the case of Cheeney v. Duke (10 Gill John., 11), the action was assumpsit, to recover the price of a slave sold by the plaintiff to the defendant. It appeared that the defendant purchased the slave with intent to remove him beyond the limits of the State of Maryland, contrary to the provisions of a statute of that state, and that this was known to the plaintiff. The Maryland court of appeals held this no defence. The authorities referred to were the same that we have cited, and they were understood as we understand them; not as exceptional cases, but as establishing a rule of decision.
We have then, I think, a very imposing array of authorities, in all of which the doctrine we have laid down was either expressly adjudged or explicitly recognized. Opposed to this doctrine, in England, stands the case of Langton v. Hughes (1 Maule Selw., 593), and, in this country, the case of Territ v.Bartlett (21 Verm., 184). These cases may be regarded as breaking the uniformity of the rule; but to say that they overcome it, or establish an opposite one, would be allowing to them an importance to which they are not justly entitled; I do not pause to bestow on them any special criticism.
In addition to these two cases, which are admitted to bear with considerable directness upon the question, the defendants' counsel have cited Lightfoot v. Tenant (1 Bos. Pul.,
551); Cannan v. Bryce (3 Barn. Ald., 179); McKormel v.Robinson (3 Mees. Wels., 434); The Gas Light Company v.Turner (5 Bing., N.C., 666); and S.C. (6 id., 314);Peck v. Riggs (3 Denio, 107); Ruckman v. Bryan (id.,
340); and White v. Buss (3 Cushing, 448). I mention these, because, although others were cited also, they are too remote to require any particular notice. I group these cases together because they do not differ essentially in principle. Some of them sustain the position that if the vendor of goods or the lender of money can be connected in intention with the illegal purpose to which the goods or money is to be applied, it is enough to defeat this action, although the unlawful use is not specified in the contract, and although he does not act in furtherance of the design beyond the sale or loan. But further than this they do not go. There is certainly room for a distinction between a case where the seller or lender simply knows of the illegal design, and one where he advances the money or the goods for the express purpose of enabling the other party to effectuate such design. For illustration, money may be lent in a gambling house, for the specific purpose of staking it on the result of a game. The law says it cannot be recovered. But suppose a broker or a banker lends money in his office in the regular course of his business, knowing his customer to be a gambler by habit, and believing that he wants the loan for gaming purposes. If the illegal design does not enter at all into the negotiation of the contract, if it forms no part of the inducement to the transaction, will the knowledge or belief of the lender (and knowledge and belief for the purposes of this question are the same) prevent him from recovering the money when it is due? Such a doctrine, I apprehend, would be highly inconvenient in a commercial community like this. It would exact a more frequent scrutiny on the part of dealers into the habits and designs of others, than the law requires any man to make.
I deem it unnecessary to go into a more particular analysis of the cases last referred to. The leading ones were cited and commented upon by Judge Selden, and we see no reason to think that they have been misapprehended.
And upon this review of all the authorities cited, although there is not entire uniformity, we think it safe to assert that they preponderate decidedly in favor of that view of the question which we adopted in deciding this case. But if the doctrine were more doubtful upon authority than we believe it is, we are constrained to say that we approve it as founded in reason and justice, when applied to cases like the present. The principle should, perhaps, be stated, with some qualifications not suggested in the former opinion of the court. The case may be put of poison, or a deadly weapon purchased for the purpose of murder. The offence intended may be of such enormity, that no man having a knowledge of the design can remain neutral without being in a just sense a criminal himself. Where the design is to violate the fundamental laws of society, a positive duty of intervention may arise to prevent the perpetration of the crime. To such cases, the rule which we laid down ought not to be applied. But if the question should ever be thoroughly examined, it will, I think, be found to have been far too broadly asserted in respect to illegal contracts, that the law does not distinguish between acts criminal in their essential nature, and those which are wrong, only because they are prohibited. This distinction cannot be made where the contract itself is prohibited, and the question is directly upon its validity. The inquiry, then, depends not so much upon the ethics as the logic of the law, which cannot both affirm and prohibit the same contract. But in respect to many incidental questions, the moral feeling and common sense of every man does discriminate, and so I apprehend does the law.
Let us look at the facts of this case on which the question turns. The sale of the Indiana state stocks was in itself a lawful and innocent contract. One of the parties had them for sale, and sold them in the regular course of its business. The other was competent to buy them for authorized and legitimate purposes. But it is said the seller knew the buyer's design to use them for a purpose, not in itself immoral or wrong, but unlawful only because not within its corporate powers. That purpose might have been strictly a religious or charitable one, but still unauthorized. Of this knowledge there is no direct evidence, and it has therefore been insisted that the surrounding circumstances were sufficient to put the vendor upon inquiry, amounting, constructively, at least, to notice of the facts. This may be granted; and it is also true that such a notice will determine many questions of mere title between parties affected by it and others who have a prior or more meritorious claim to the consideration of courts. But was the doctrine ever applied to a case like this? The sale itself being a lawful commercial transaction, and even the ultimate purpose of the vendee to exceed its corporate powers, involving nothing in itself immoral or wrong, where, it may well be asked, is the moral guilt of the vendor, which should be visited with a positive penalty far exceeding in pecuniary amount any known to our criminal jurisprudence? The discriminations which have been suggested may sometimes be difficult to make, but courts must make them, or the law becomes an instrument of the most absurd injustice. The difficulty does not exist in the present case.
The second ground of defence to the claim under consideration was, that the contract for the sale of the state stocks provided for receiving in payment the negociable promissory notes of the North American Trust and Banking Company, on time, and was on that ground illegal and void. We are asked to review our conclusions on this branch of the case also, and we have done so.
If the certificates or post notes of the Trust and Banking Company were issued for "the purpose of loaning them or putting them in circulation as money," they were not authorized by the general banking law of 1838, because the issuing power under that act is confined to notes payable on demand, countersigned and registered in the comptroller's office, and secured in the manner provided. As a consequence of not being authorized, they were expressly forbidden by the restraining act of 1830, which applies, and is now in force as to all "persons, associations of persons, and bodies corporate, not expressly authorized by law." (1 R.S., 712, § 6; Chancellor Walworth in Safford v.Wykoff, 4 Hill, 444.) Viewed in this light, therefore, the act of issuing these notes was (first) ultra vires, or beyond the corporate power of the Trust and Banking company, and (second) forbidden under the penalties of the restraining law, the penalties being a forfeiture of $1000 by every person or corporation violating the prohibition, or "assenting" to such violation. In deciding this case, we assumed that the post notes were void, but held that the claimant was entitled to disaffirm the contract, and recover the value of the state stocks for the price for which the notes were given. This position we are constrained to adhere to, after an attentive reconsideration.
It may well be conceded, that a contract entered into by the agents of a corporation, which, either in substance or form, transcends its powers, creates no legal obligation, and cannot be enforced. But it is one thing to say that a void or forbidden contract cannot be enforced, and quite another to hold that both the parties are involved in moral guilt, so that neither can disaffirm it, and recover upon an implied assumpsit the money or value which he has advanced. A general distinction of this kind has been universally recognized, although the cases do not all agree as to the conditions under which it is to be applied. It is enough that the distinction itself is well settled, for we are satisfied that it has not been misapplied in the present case.
The maxim "in pari delicto potior est conditio defendentis" has never been applied to the case of a person contracting with a corporation, simply beyond the powers of the latter. To this remark the cases of the East Anglian Railway Company v.Eastern Counties Railroad Company (7 Eng. Law and Eq. R.,
505); McGregor v. Manager Deal and Dover Railroad Company (16id., 180); and The Mayor of Norfolk v. The Norfolk RailroadCompany (30 id., 120) form no exception. In all these cases the action was founded upon, and affirmed the unauthorized contract, and in none of them was the maxim quoted, or the reasons of policy on which it is founded so much as alluded to. Indeed, the maxim can very rarely be used in such a case without a total perversion of its original design. An instance might, no doubt, occur where the person dealing with a corporation might be shown to be an active and contriving agent in the unauthorized transaction. Then the law might leave him where it found him. It is not necessary to deny that the Morris Company might have received the post notes in such complicity with the company that issued them as to be an equal sharer in the violation of law. It might possibly be true, that the sale of the Indiana stocks was contrived for the very purpose of getting possession of the notes, in order to put them in circulation, contrary to the laws and policy of the State of New-York. But such was not in fact the transaction. The Morris Company had the state stocks, which it wished to sell, and the Trust and Banking Company wished to buy them, but wanted credit for the purchase money. This was agreed to, and the notes were given as the evidence of the debt. That was the whole transaction. The sale itself, as we have seen, being lawful, it is not doubted that a security for the price might be given in some form free from objection. In the particular form of a negotiable instrument, it is said they were illegal and void. It may be so, but the only necessary consequence is, that the creditor received a worthless security. It by no means follows that the vendor of the stocks was guilty of such moral delinquency as to involve a total forfeiture of the article sold. It is admitted that the contract of a corporation, which it has no legal capacity to make, cannot in its terms be enforced. But does it follow that the alleged transgressor may appropriate, without compensation, the money, the goods or the services of the person with whom it deals? There are, no doubt, authorities upon the general question, which cannot be reconciled, but it is safe to say that such a rule as this has never been established.
The same considerations apply, if we regard the post notes as issued in violation of the express provisions of the restraining law. The prohibition is upon the person, association or corporation which issues the paper, and not upon the more unfortunate recipient. The penalty, it is true, is imposed in broad language upon "every person and corporation, and every member of a corporation, violating the provision or assenting to such violation;" but this does not, upon any fair and reasonable construction, include a stranger who deals with the offending person or corporation. In the language then, of Lord Mansfield (Browning v. Morris, Cowp., 790), "the statute itself has marked the criminal." The counsel for the defendant have denied there is any distinction founded on this circumstance. It cannot be denied, however, that there are cases both in England and in this country, where the distinction has been recognized, nor that it has the sanction of very eminent names, such as Mansfield, Sir William Blackstone, Chancellor Kent, and Chief Justice Parker. It has never been in terms repudiated in any case entitled to weight as authority, and we think it a sound and reasonable distinction where the act prohibited involves in itself no moral turpitude, and would be innocent if not forbidden. Without going over the cases at large, we see no reason to change the views upon this question which we entertained when the cause was decided.
In determining the case upon these principles, we necessarily assumed that the certificates or post notes were void, either as issued by the corporation ultra vires, or as falling under the prohibitions of the restraining act. This was assumed without special examination, because we felt less difficulty in disposing of the case in the manner we did, than it was supposed we might encounter in affirming the validity of the notes. If we had held them valid, the result would have been a simple affirmance of the judgment of the supreme court. It is proper, and perhaps necessary, now to say, that we did not and do not now intend to pass definitely upon that question. The respondents, however, do not ask a reargument, and the appellant has no right to ask one for the purpose of having the validity of the notes established, and the judg ment thus affirmed instead of modified as it now is.
The motion must be denied.
All the judges, except A.S. JOHNSON, J., who took no part, were in favor of denying the motion; and all the judges, except DENIO, Ch. J., and A.S. JOHNSON, J., concurred that mere knowledge, by the vendor, that the vendee, at the time of the purchase of property, intends to use it for an illegal purpose, will not prevent the vendor from recovering from the vendee the value of the property.
Motion denied. *Page 194 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 195 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 196 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 197 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 198 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 199 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 200 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 201 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 202 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 203 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 204 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 205 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 206 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 207 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 208 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 209 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 210 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 211 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 212 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 213 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 214 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 215 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 216 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 217 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 218