ANNA PHILLIPS, Plaintiff, *v.* INVESTORS' SYNDICATE, Defendant.

Municipal Court of New York, Borough of Mannattan, Fourth District, September 29, 1932.

*Matthew M. Black* [*Herman Kohn* of counsel], for the plaintiff.

*Phillips, Mahoney, Leibell & Fielding* [*George A. Spohr, Jr.*, of counsel], for the defendant.

LEWIS, DAVID C., J. The defendant is incorporated under the general statutes of Minnesota, and is an institution subject to "the scrutiny" of the State Banking Department of that jurisdiction (Plaintiff's Exhibit 3). It holds a certificate of the Secretary of State of New York, authorizing it to do business in our State as a business corporation.

The defendant has never complied with the requirements of our banking statutes; it holds no authorization to conduct an investment company within our jurisdiction.

The plaintiff contends that the defendant's transactions and operations in our State constitute the conduct of an investment company within the meaning of our banking statutes.

The defendant insists it is not conducting the business of an investment company, as defined by our banking statutes, and that its transactions are valid and its contracts enforcible, under our laws and in our courts.

Paragraph second of the complaint explicitly alleges "that the defendant was and still is engaged in the business of an investment company; that it issued and sold various forms of installment invest-

ment or savings certificates or bonds to investors, and that the proceeds received therefrom were used by defendant for investment in mortgages, etc.; that it received deposits and installments from purchasers of said certificates or bonds; that such certificates and bonds provided for the withdrawal by the investors of the moneys paid in, with increase thereof, and for the payment to them of fixed sums of money at fixed future times; and that it sold accumulative investment certificates and debentures upon payments of money in installments in sums of less than five hundred dollars each." (See paragraph second of the complaint).

It is furthermore alleged " that it heretofore made application to the superintendent of banks for such a license, but that the same was not granted * * * but that, nevertheless, the defendant did at all times hereinafter mentioned engage in the said business of an investment company in the State of New York." (Paragraph fifth of the complaint.)

There are further allegations in the complaint setting forth, in substance, the terms of the investment certificates and the conditions therein contained, which it is not material at this moment to specifically recite. Except in so far as the allegations involved the documents themselves and the terms thereof, the defendant in its answer substantially denies the same.

The plaintiff's affidavits disclose the following facts: That the plaintiff purchased this investment certificate upon solicitation by the defendant's agent at the plaintiff's residence; that when the plaintiff subscribed, she did not know that the defendant had no authority from the Banking Department to conduct this business.

Upon learning the facts, she discontinued payments, elected to rescind, and tendered back the certificates. From the plaintiff's papers, it further appears that the defendant had made application to the Superintendent of Banks for authority to operate in this jurisdiction; but it was refused, and thereafter defendant sought to withdraw its application. The details of these proceedings cannot be procured by the plaintiff from the banking authorities.

It is also stated that the defendant recently discontinued the further direct sales by it to the public of these investment certificates in this jurisdiction, and, apparently, now conducts substantially the same activities through the " Investors' Syndicate " and " Title and Guaranty Company," a corporation in which the defendant holds substantially the entire capital stock.

Then, again, the moving papers indicate that application was made in 1917 to issue and sell savings or investment certificates, and three additional applications were made in 1927 for the issuance and sale of certificates either fully paid or on the installment plan, to the

securities division of the department of commerce and securities of the State of Minnesota.

In these applications it would appear that the defendant sought a license as an investment company, stating that the proceeds were to be invested in first mortgages on improved real estate.

In the face of these evidentiary recitals, defendant practically remains silent, contenting itself with a general denial. It submits neither facts nor figures which would establish the character of the business it is conducting in this jurisdiction, or indicating that the marketing of these investors' certificates do not constitute its principal activity. The opposing affidavits, made by an attorney associated in the office of defendant's counsel, challenges the sufficiency of the plaintiff's papers, but submits no evidence in contradiction of their contents.

The plaintiff supports her application with affidavits and exhibits, reciting the history of this defendant's applications in its home State to float such investment certificates, and designating itself as engaged " principally in issuing and selling its cumulative installment and coupon certificates," and from which it appears that its activities along these lines have been the subject of considerable litigation in several jurisdictions, traveling to the United States Supreme Court,

A reference to the litigation in the Federal courts of Montana and Nebraska (reviewed by the United States Supreme Court) indicates that in those actions and proceedings this defendant, by its own statement of facts, stamped its activities as those of an installment investment company. (See *Investors' Syndicate* v. *Porter*, [D. C.] 52 F. [2d] 189, and *Investors Syndicate* v. *Bryan*, 113 Neb. 816; 205 N. W. 294.)

As initial conclusions, we may deem it established that a foreign corporation conducting the business of an investment company in our State, without compliance with the statutory requirements, could not sue upon a contract made in our State, in the conduct of such business; that the statute regulating and restricting the investment companies was conceived to protect the public by prohibiting an unauthorized corporation from engaging in the business of marketing or vending these investment certificates in our State.

Banking is a business affected with a public interest. (*Noble State Bank* v. *Haskell*, 219 U. S. 104; 31 S. Ct. 186; 55 L. Ed. 112; *Meserole Securities Co.* v. *Cosman*, 253 N. Y. 130, 133.)

And because the defendant may have ignored the statute is no reason for the court to follow suit. To thus abruptly deny the plaintiff relief would appear tantamount to depriving her of the full protection of the statute. Respect for the inherent righteousness of the law impels the conviction that the plaintiff should not be held to

the continued performance of a contract that the law prohibited the defendant from undertaking and prevents it from performing.

Precept and precedent are in happy accord on this subject.

Defendant would rescue the transaction from condemnation on the theory that the contract is not inherently void; that, if the defendant is operating in New York without proper authority, it is for the Attorney-General to question the defendant's power to transact such business in this State. This argument manifestly presents its own refutation.

The plaintiff is not seeking to compel the defendant to comply with our statute, nor to stop the defendant from conducting a banking business without proper authority. The plaintiff does not seek the enforcement of the statute; but, on the contrary, asserts a cause of action due to the failure of the defendant to comply with the statute, arising out of the violation of the statute.

The security given may be void, but the loan secured valid. (*Duncomb* v. *New York, H. & N. R. R. Co.*, 84 N. Y. 190, at p. 201; *Pratt* v. *Short*, 79 id. 437, 447.) If the affidavits and proof warrant it, this court would not be justified in withholding the relief now sought.

The remedy of summary judgment, as it now stands, is of comparatively recent appearance in our judicial procedure, but it comes of old stock and of respectable origin. It calls upon the court to end the day of pretense and insist on proof. No longer can the defendant simply put forth his denial and " an answer false in fact but good upon its face," and smugly bide his time, enjoying the refuge of congested calendars and the unfair advantage of delayed trials. (*Strasburger* v. *Rosenheim*, 234 App. Div. 544; *Dodwell & Co.* v. *Silverman*, Id. 362.)

The question is whether enough evidence is presented to show the nature of the business carried on, and the nature of the transactions.

" Especially in view of the fact that *defendant* introduced no evidence whatever to show that it carried on any other business." (Note: The word " plaintiff," appearing in the authority cited, changed to the word " defendant " in applying to the case at bar.) (*Proper Spirit Trading Corp.* v. *Schilowitz*, 140 Misc. 171.)

The court is mindful of the fact that, in passing judgment, it is not to be controlled by the mere form of the transaction. The act of borrowing money as an incident to and for use in the conduct of his legitimate business is common to the life of every business corporation.

The validity of such an engagement is not destroyed by the form it takes. In form, the contract may be identical with the engagements expressly defined by the Banking Law, as a purpose for which

an investment company is to be organized, and yet be immune from attack. (*Jacobs* v. *Monoton Realty Inv. Corp.*, 212 N. Y. 48.)

Ordinarily, it is not simply a question of form; it is only when the execution of such banking-like engagements become a principal activity of a business corporation, as contrasted with being a mere incident to the conduct of its principal enterprise, that the business corporation becomes engaged in banking and invades forbidden precincts.

Particularly significant in this connection are the statements made by the defendant in its applications for permission to issue and sell savings or investment certificates, filed with the securities division of the State of Montana.

In stating the amount of these securities to be offered for sale in that State, the defendant stated: In the first application made in 1917, " All it can sell, or until such times as it is unprofitable to sell."

In its second application, made in 1927, it stated: " That the total amount of the issue is unlimited and that the amount covered by this notification is $5,000,000 maturity value."

In its third application, made in 1927, it stated: " Nine million cumulative installment certificates and one million coupon certificates."

In its fourth application, made in 1929, it stated: " Ten million of cumulative installment certificates."

Can it be seriously urged that these facts and figures indicate merely borrowing by the defendant business corporation, as incidental to the conduct of its legitimate enterprise? To urge such a conclusion from such facts is like fitting a square peg in a round hole.

But at this junction one is reminded of section 302 (as amd. by Laws of 1929, chap. 75, and Laws of 1931, chap. 490) and section 517 of the Banking Law (added by Laws of 1931, chap. 494), especially regulating foreign corporations:

" § 302. No person shall act in this state as the representative of any foreign corporation in transacting the business described in this chapter as the business of an industrial banking company. * * * "

" § 517 * * *. Any foreign corporation either selling or offering for sale in this state accumulative investment certificates or debentures upon payments of money in installments in sums of less than five hundred dollars each shall be construed as transacting the business of an investment company and shall be subject to the provisions of this article relating to such corporations."

Both of these sections, as they now stand, incorporate amendments enacted in 1929 and in 1931.

.In the light of the previous decisions of our courts relating to this subject, one concludes that these amendments were adopted to meet the situation that such decisions presented.

And I take it that, since these amendments, the transactions of *any foreign* business corporation falling within their provisions are invalid.

Such engagements of any foreign corporation can no longer be saved from impairment on the theory that they are incidental to the conduct of a legitimate business, as distinguished from the cases where they constitute a form of banking business improperly conducted by a business corporation.

These special statutory provisions supply added grounds for the plaintiff's right of recovery. And, whether one follows the road of reason or the path of precedent, he arrives at the same conclusion.

An early Court of Appeals decision (*Tracy* v. *Talmage*, 14 N. Y. 162, at pp. 182, 183) puts us on firm footing, as excerpts from it will show.

" ' But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, etc. If such laws are violated, and the defendant takes advantage of the plaintiff's condition or situation, *then the plaintiff shall recover;* and it is astonishing that the reports do not distinguish between violations of the one sort and the other.' Two things are to be noted in this extract. That a distinction is taken between contracts *malum prohibitum* merely, and such as are immoral or contrary to general principles of policy; and also that stress is laid upon the fact that the law contravened in this case was intended to protect one party from oppression by the other. The first is a valid distinction, which runs through all the subsequent cases — the last was merely incidental to the particular case, and not essential to the principle. The first cases in which the principle was applied, were naturally those where the statute violated was intended for the special protection of the party seeking relief from some undue advantage taken by the other, because those were the cases in which the injustice of applying the same rule to both parties would be the most glaring. But it soon came to be seen that the principle was equally applicable to cases where the law infringed was intended for the protection of the public in general. * * *

' ' To decide that this action cannot be maintained, would be to secure to the defendants the fruits of an illegal transaction, and would operate as a temptation to all banks to violate the statute by taking advantage of the unwary and of those who may have no actual knowledge of the existence of the prohibition, and who may deal

with a bank without any suspicion of the illegality of the transaction on the part of the bank.' "

At pages 186, 187: " This language is as applicable to the case before us as to that in which it was used. It is said that all persons dealing with banks and other corporations are presumed to know the extent of their powers. This is no doubt technically true, and yet we cannot shut our eyes to the fact, that in very many cases it is a mere legal fiction. If we take the present case as an example, it is plain that it would not have been easy for the Morris Canal and Banking Company, with the charter of the Trust and Banking Company and the restraining act both before them to determine whether the issue of these certificates in payment for state stocks would violate either; and yet, upon the doctrine here contended for, an honest mistake in this respect would visit upon the former company a forfeiture of the entire amount of stocks transferred, which the latter company, if disposed, might pocket. Such a principle would afford the strongest possible inducement for banks to transgress the law. All that they could get into their hands, by persuading others to take their unauthorized paper, would be theirs. Under such a rule, arguments to make it appear that they have power to do what they really have not, might be made to constitute the most available portion of their capital; and unauthorized dealing in large amounts, with foreign states or corporations not familiar with our laws, the most profitable branch of their business."

At pages 188, 189: " ' In analogy to the statute against gaming, the notes and securities are absolutely void, into whatever hands they may pass; but there is a material distinction between *the security and the contract* of lending. The lending of money is not declared to be void, and, therefore, whenever money has been lent, it may be recovered, although the security itself is void.' Judgment was, however, given for the defendant in that case, because the action was brought upon the note alone. The next case was that of *Utica Insurance Company* v. *Kip* (8 Cow. [N. Y.] 20). This, also, was an action upon a note discounted by the insurance company; but the declaration also contained a count for money lent. The plaintiff recovered; and the courts say: ' The illegal contract, if any, was not the loan, for the plaintiffs had a right to loan the money to the defendants; but it was the agreement to secure the loan by a note discounted. Avoiding what was illegal, does not avoid what was lawful. *The action for money lent, is rather a disaffirmance of the illegal contract.*' Similar decisions were made in three subsequent cases, viz.: *The Utica Insurance Company* v. *Cadwell* (3 Wend. [N. Y.] 296); *The Utica Insurance Co.* v. *Kip* (3 id. 369); and *Utica Insurance Co.* v. *Bloodgood* (4 id. 652)."

At page 190: " Where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, such an action can in no case be maintained; but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it, presumes it to be void and seeks to prevent the defendant *from retaining the benefit which he derived from an unlawful act,* there it is consonant to the spirit and policy of the law that he should recover."

At page 191: " Recoveries are not had in such cases upon the basis of the *express* contract, which is tainted with illegality; but upon an implied contract, founded upon the moral obligation resting upon the defendant to account for the money or property received."

The defendant cites the decisions of two of my learned colleagues:. *Business Men's Mortgage & Credit Corp.* v. *Dobjinsky* (135 Misc. 628, 629); *Yorkville Business Protective Corp.* v. *Friedman* (143 id. 333).

A later ruling of the Appellate Term points out the limitation of these precedents and distinguishes them from the case now before us (*Yorkville Business Protective Corp,* v. *Friedman,* 144 Misc. 325).

It is true that Mr. Justice LAUER incidentally comments: " The only concern of this court is whether the instrument sued on is made void by the statute. If the plaintiff is doing business contrary to the laws of this State, other and appropriate remedies are open to the proper parties for the enforcement of these other laws."

The language of the court (indicating that the court was not concerned with the fact that the business conducted might be contrary to the laws of the State) makes us prefer to treat such observation of the court as merely *obiter dicta.*

The Court of Appeals long ago set at rest any doubt on the questions presented. Its clear language and convincing logic are as applicable now as it was then.

" The American Dairy-Salt Company, Limited, was a business corporation, organized for the manufacture of salt. It was incorporated under a statute which authorized the formation of business companies, was adapted for the purpose of such organizations, and contained none of the safeguards which have always been exacted and required of corporations authorized to do a banking business, or the receiving of the money of others on deposit for safekeeping or investment. We thus find a reason founded on public policy, for the prohibition contained in the statute referred to, applying to corporations not expressly incorporated under the statute providing for the incorporation of banks, which contains the safeguards exacted from such corporations which are to engage in the business of dealing with the money of others.

"It appears to us that the corporation, in accepting the funds of the plaintiff, in special account upon deposit, exceeded its corporate power, and engaged in a business in which it was not authorized, and that, consequently, its contract with the plaintiff, if such was its nature, was *ultra vires;* if so, the plaintiff's right of action for the moneys delivered to the corporation at once accrued.

"It is not our purpose here to enter upon any discussion as to whether the contract in question was *malum in se* or was simply a contract unauthorized. The corporation is not here seeking to enforce any of the provisions of the contract. In either case the contract was *ultra vires,* and formed no obstacle to an immediate action for the money." (*Chapman* v. *Lynch,* 156 N. Y. 551, at p. 559.)

Motion granted. Ten days' stay after the service of a copy of the judgment with notice of entry.