Isaac Benwitt, Plaintiff, *v.* Investors Syndicate, Defendant.*

Municipal Court of New York, Borough of Manhattan, Third District,
November 30, 1933.

* See, also, *Fosdick* v. *Investors Syndicate* (240 App. Div. 877); *Phillips* v. *Investors Syndicate* (145 Misc. 361); *Gantz* v. *Investors Syndicate* (148 id. 274); *Kaufman* v. *Investors Syndicate* (Id. 624).

*Herbert L. Hutner*, for the plaintiff.

*Schurman, Wiley & Wilcox*, for the defendant.

LEWIS, DAVID C., J.   When these motions were brought before this court, similar litigation, instituted by a different plaintiff but against the same defendant, was the subject-matter of an appeal to our Appellate Division.

Since then the learned Appellate Division has rendered its decision affirming, without opinion, an order of Mr. Justice HAMMER denying that plaintiff's application for summary judgment (*Fosdick v. Investors Syndicate* (240 App. Div. 877).   Except for the statement that there was " a triable issue," Mr. Justice HAMMER rendered no opinion.

The expectancy shared by counsel and the court that the Appellate Division would render an opinion, invited deferment of any expression by this court.   At this time frankness bids this court to deferentially confess its own impressions *contra* to the determination of the learned Appellate Division.

A previous ruling by this court (dealing with a transaction analogous to those involved in this litigation) passed upon the New York business of this defendant.   (*Phillips v. Investors Syndicate*, 145 Misc. 361.)

Upon appeal that decision remained undisturbed.

The propositions of law dealt with and the facts found in the *Phillips* opinion are not fully repeated at this time, though they are again sustained.

However, defendant claims that certain issues presented now were not passed upon then.

(1) In the present controversy the defendant contends that its transactions constitute contracts made in Minnesota, valid in Minnesota, and, therefore, immune from attack in our State. Were all steps of the transactions completed within the territorial limits of New York, this contention that its transactions are Minnesota contracts would have no leg on which to stand.

Defendant seeks to supply support for this contention in that the form of the so-called application for the sale of its certificates

of investment, regularly offered by its duly authorized agents in the State of New York, to residents of the State of New York, and signed by our citizens at New York, contained a notation, "Subject to approval at Minneapolis, Minnesota."

Because of this provision, the defendant insists that its transactions constitute Minnesota contracts, and that the validity of its acts must be determined by the laws of Minnesota, and not by the decisions of New York.

The defendant would have the court so hold notwithstanding the resident purchaser of the certificate personally delivered his signed agreement to buy to the solicitor of the defendant at New York; that the defendant either had its agent personally deliver the certificate to the purchaser at New York, or had it delivered by mail at New York, and the purchaser did not in any instance send or submit his agreement to buy by mail, while in every case the receipt of the certificate by the purchaser was the only communication to the purchaser of the defendant's approval.

Aside, therefore, from the conclusion that the meeting of the minds took place at New York (*Kaufman* v. *Investors Syndicate*, 148 Misc. 624), the fact remains that the communication of a formal acceptance and hence even the formal consummation of the contract took place at New York. (*Klotz* v. *Angle*, 220 N. Y. 347.)

The defendant's transactions are not actual sales. Practically they are loans.

The defendant secures the use of the moneys and undertakes to repay the same with certain additions.

The full principal sum recited in the certificate is not paid at one time — this is not the plan.

It is an "accumulative installment certificate." The installments are paid at New York to the defendant at different times. Thus we have a series of transactions all taking place in our jurisdiction. (See certificate and provisions.)

The defendant cites cases holding that an insurance contract is made when and where the policy is issued. I do not believe these citations control. For one thing, the protection of life or property cannot unduly wait on the actual receipt or acceptance of the policy by the insured.

While insurance contracts are not to be classed or confused with the ordinary or other classes of agreements, the policy of the law that seeks the proper protection of the insured in those cases suggest an analogous construction protecting the public in these cases. In this connection, one cannot be forgetful of the fact that banking,

like insurance, cannot be conducted without the permission of the State.

In passing on this proposition, the court inquires whether it is to ignore the further contention also vigorously urged by the defendant that it had a right to practically conduct (if not legally complete) these very transactions in our State. And is the court to conclude that the defendant no longer asserts that it had fully endeavored to comply with the law? Does it also now abandon the unsuccessful plea that the error of the Superintendent of Banks, in not holding it subject to the banking laws, excused the defendant from its non-compliance? (See *Phillips* v. *Investors Syndicate, supra,* and *Kaufman* v. *Investors Syndicate, supra.*)

Otherwise it strikes me that the defendant in one breath avows its belief in the validity of the business it conducted in this State, and in the next breath insists it did not actually conduct such business in this State. While it would claim estoppel because of the misleading or mistaken opinion of the Superintendent of Banks, at the same time it contends it did not rely upon or follow the opinion of this official.

In this way it seems the defendant's contention would play legerdemain with the law; the foreign corporation is here but it is not here. Now you see it and now you don't.

The form and provisions of the certificates of investment and the unchallenged facts establish that the business done by the defendant in New York constituted a part of the business of an investment company.

The defendant cannot deny it has been conducting this business in our jurisdiction. It not only sought the privilege to conduct its business here, but it protests the validity of its New York transactions.

The pertinent query then is whether the business concededly done by the defendant within the State of New York, whether the transactions between these parties within our jurisdiction, violate the laws of our State.

The defendant's certificate of incorporation is not controlling on this subject. The wording of the defendant's charter, received from its parent State, may show its purposes and powers; it will not show its actual business. What the corporation actually does, not what it may do, establishes the business in which it is engaged.

The defendant parades the fact that it has extensively marketed these investment certificates in our jurisdiction and that there are " many thousand certificate holders in New York."

From its own lips comes the admission that " its contract lia-

bility to its certificate holders shows $36,077,984.48." (See p. 7 of defendant's affidavit of Henry W. Berg.)

Instead of challenging the finding that this defendant's business in New York was the marketing or sale of these certificates, the defendant insists that, because its sales of these certificates run into many millions of dollars, equity grants it immunity from attack.

The defendant is a Minnesota corporation. In 1922 it secured permission to conduct business in this State as a business corporation.

At no time has it been authorized to carry on the business of a banking or investment corporation — or any part thereof.

So far as the law of New York is involved, no business corporation has the right to do *any* banking business. The statute specifically prohibits any corporation other than a banking corporation from engaging in any form of banking and from transacting the business of an investment company or *any part thereof.*

Section 303 of the Banking Law in part reads: " Every foreign corporation before being licensed by the superintendent of banks to transact in this state the business of an investment company, *or any part thereof."* (See General Corp. Law, § 18; Banking Law, §§ 106, 140.) (See, also, Banking Law, §§ 290–293, 298.)

" The general restriction against any *other* form of banking not only amplifies but characterizes the specific restrictions. It forms a guide post to the legislative intent, made more conspicuous by the title of the section, ' Prohibition of *banking powers.'* " (*Meserole Securities Co.* v. *Cosman,* 253 N. Y. 130, at p. 135.)

With meticulous care Judge LEHMAN explains the limits upon a business corporation to exercise some of the powers of a banking corporation — to do some of the things a bank can do — in the course of its *commercial transactions.* A business corporation may speculate in commercial paper; it may purchase promissory notes and sell them; it may receive certain moneys, hold them, and, *in conjunction with its legitimate and duly authorized commercial transactions,* even advance credits. But no business corporation can, under the guise of commercial transactions, function as a banking corporation. (See *Meserole Securities Co.* v. *Cosman, supra.)*

In the instant case the defendant did not operate as a factor; it was not conducting a department store; nor was it engaged in business as either a merchant or a retailer.

To the contrary, it is apparent that it was actively and actually engaged here in the sale of these securities.

Defendant relies to a great extent upon the law expounded to sustain its transactions in the *Monaton* case. (See *Jacobs* v.

*Monaton Realty Investment Corporation*, 212 N. Y. 48.) The *Monaton* case did not work any amendment of the statute. This decision did not endow a business corporation with the power to carry on any banking business.

To the contrary, the *Monaton* case reminds us that it is the fact and not the form that must control.

(2) The defendant also insists that principles of equity control this case and, therefore, equity prohibits a recovery by the plaintiff.

To indorse the defendant's plea, that because the enforcement of the statute might work a hardship against it or cause it injury, therefore, the court should ignore the law, is a far cry from equity. The court observes that this defendant is not here with clean hands. From its inception this very transaction was tainted with illegality. For if the defendant never possessed the right to do this business, can equity chasten its transgression? It seems to me that to compel the defendant to rightfully return what it wrongfully received is a horse of a different color from the case where the party has received, retained and used goods or merchandise constituting " a just return for every dollar they have parted with." (*Schank* v. *Schuchman*, 212 N. Y. 352.)

One is puzzled to understand how the plaintiff's conduct could change the law. It is the Banking Law not the plaintiff's act, that condemns the defendant's transactions.

Hence I do not believe the determinations cited by the defendant, rendered in kindred cases and apparently based upon the application of equitable principles to actions for money had and received, control this case.

The plaintiff had the right to loan his money. There was nothing unlawful in the plaintiff's conduct. (*Tracy* v. *Talmage*, 14 N. Y. 162, 186, 187; *Chapman* v. *Lynch*, 156 id. 551.)

(3) The defendant protests against the ruling that the extent of these transactions enters into the question. It contends that the consideration of this feature injects unwarranted confusion. Suffice it to say: " For these reasons it seems clear that under a reasonable construction of the relevant statutes business corporations may not *encroach upon the* field of banking occupied by banks of discount by ' making discounts ' *even though they perform no other banking function;* yet they are not restrained or prohibited from purchasing notes at a discount where such purchase is not *a mere device for carrying on the business* of advancing or loaning money at interest, a form of banking customarily conducted by banks of discount, but is in fact as well as in form a commercial transaction of bargain and sale. *There may be times when it is*

*difficult to draw the line.*" (Italics mine.) (*Meserole Securities Co. v. Cosman, supra,* at p. 147.)

" Enough evidence is in the record, however, to show the nature of the business carried on by the plaintiff and the nature of the transaction in question, especially in view of the fact that plaintiff introduced no evidence whatsoever to show that it carried on any other business." (*Proper Spirit Trading Corp.* v. *Schilowitz,* 140 Misc. 171, 173.)

For the *Jacobs Case* (*supra*) expressly recites that the power of an ordinary stock corporation to borrow money, contract debts, and to issue an obligation of any particular form, is confined to those instances when it *is necessary for the exercise of a lawful purpose of its* incorporation.

In the case at bar one vainly seeks any proof that the moneys borrowed through the medium of these investment certificates were necessary for the exercise *of any lawful purpose of its incorporation.* Upon reading the papers one asks: If the defendant was not doing an investment company business in New York, what, if any other, business was it doing here?

And how could the Superintendent of Banks or the Secretary of State determine in advance that the defendant corporation would make these banking transactions its main business or that it would only engage in them " merely as a part or incident of a commercial business." (Quoted portion taken from *Meserole Securities Co.* v. *Cosman, supra,* at p. 137.)

(4) The defendant further maintains that an interpretation of the amendment of March, 1929, of the Banking Law, which would make it cover the activities of the defendant in New York, would make it unconstitutional.

Defendant's contention that it did not " offer " to sell the certificate to the plaintiff, but that the plaintiff made the application to buy, is constituted entirely of argument and not fact. For it is not to be seriously urged that the plaintiff sought out the defendant; to the contrary, the defendant's agent solicited the plaintiff, proffering him the application and prevailing upon him to subscribe. Even if defendant's offer to the plaintiff was *conditional,* it was nevertheless *an offer.*

The defendant does not and cannot deny the right of the State as a valid exercise of its police power to regulate banking.

The defendant would hold sections 302 and 517 of the Banking Law, providing that a foreign corporation selling or offering for sale such certificates in this State shall be construed as transacting the business of an investment company, is an unconstitutional discrimination against foreign corporations.

It cannot be questioned that the State has an absolute right to alter or repeal the charter granted a foreign corporation. (*Noble State Bank* v. *Haskell*, 219 U. S. 104, at p. 109.)

The defendant cites a line of cases condemning statutes resulting in the impairment or deprivation of property legitimately acquired by a foreign corporation. Those decisions dealt primarily with tax laws, and involved unlawful and discriminatory taxation.

The 1929 amendment to the Banking Law does not deprive the plaintiff of property rights. It does not necessarily affect prior acts. It is merely an exercise of the right of the State to regulate banking transactions and constitutes a legitimate exercise of the police power of the State for the protection of its inhabitants. (*Fougera & Co.* v. *City of New York*, 224 N. Y. 269.)

The right and even the *implied intent* of the Legislature to limit the application of its statutes to a domestic or to a foreign corporation has been sustained by our courts. (*Bogardus* v. *Fitzpatrick*, 139 Misc. 533; *German-American Coffee Co.* v. *Diehl*, 216 N. Y. 57.)

What justification or necessity is there for the court to weaken, no less deny the right of the State to protect our citizens in the conduct of such transactions by a foreign business corporation with the citizens of New York?

The obvious distinctions between the rights and regulations — the powers and privileges — of a foreign and domestic corporation warrant and support the express restraint of a foreign business corporation, accomplishing here, in a practical way, the very things our laws prohibit a New York business corporation from legally performing in our State.

To permit a foreign corporation to come into our State and by this procedure take its revenue from citizens, without complying with our laws, would discriminate against the citizens and corporations of our own State.

These are my views. But this is a lower court.

The Appellate Division does not, at this time, see it that way.

In the absence of any specific positive declaration from the higher court, ours may be the privilege to differ, but not the power to dissent.

For the present the plaintiff must be denied his relief.